STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Edward G. WELSH, Defendant-Appellant.

Supreme Court

*No. 80–1686. Argued March 1, 1982.—Decided July 2, 1982.*

(Also reported in 321 N.W.2d 245.)

For the plaintiff-petitioner the cause was argued by *Stephen W. Kleinmaier,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Archie E. Simonson* of Madison.

WILLIAM G. CALLOW, J.   This is a review of a May 26, 1981, decision of the court of appeals vacating an order of Dane County Circuit Judge Mark A. Frankel and remanding the matter to the circuit court for further proceedings.  We reverse the decision of the court of appeals and affirm the order of the circuit court.  The trial court revoked the defendant's motor vehicle operator's license for sixty days pursuant to his unreasonable refusal to submit to a breathalyzer test, as required by sec. 343.305(2) (a),. Stats. 1977,[1] after having been issued a citation for the operation of a motor vehicle while under the influence of an intoxicant.  Section 346.63(1), Stats. 1977.[2]

---

[1] Section 343.305(2) (a), Stats. 1977 provides that

"**Revocation of license on refusal to submit to tests** . . . (2) (a) If a law enforcement officer has probable cause to believe that a person has violated s. 346.63(1) or a local ordinance in conformity therewith, the officer may request the person, prior to arrest and issuance of a citation, to take a preliminary breath test for the purpose specified under sub. (1), using a device approved by the department for the purpose. A person may refuse to take a preliminary breath test without being subject to revocation under sub. (9) if he or she consents, after arrest, to take a test under par. (b). Neither the results of the preliminary breath test nor the fact that it was administered shall be admissible in any action or proceeding in which it is material to prove that the person was under the influence of an intoxicant or a controlled substance." *Id.*

[2] Section 346.63(1), Stats. 1977, provides that "[n]o person may drive or operate a motor vehicle while under the influence of an intoxicant or a controlled substance."

The defendant challenges the officer's warrantless arrest in his residence as violating the Fourth Amendment of the United States Constitution and Article I, section 11 of the Wisconsin Constitution.[3] The circuit court upheld this warrantless arrest concluding that probable cause to believe that the defendant had been operating a motor vehicle while under the influence of an intoxicant, coupled with the existence of exigent circumstances, justified the officers' entry into the defendant's residence. The defendant appealed from this circuit court order, and a single judge of the court of appeals reversed the trial court, holding that, although the officers' warrantless arrest was unreasonable, thereby violating the Fourth and Fourteenth Amendments, the absence of a finding regarding a consensual entry necessitated remanding the case on that issue. We affirm the findings of the circuit court, holding that the co-existence of probable cause and exigent circumstances in this case justifies the warrantless arrest and obviates any further discussion concerning the issue of consensual entry.

Prior to resolving the merits of this case, the state challenges the single-judge ruling of the court of appeals, contending that this should have been decided by a three-judge panel. Section 752.31(2), Stats. 1977, provides a

[3] The requirements contained in the Fourth Amendment of the Federal Constitution are binding against the states through the Fourteenth Amendment. Further, the provisions of the Fourth Amendment to the Federal Constitution are identical to those contained in Article I, sec. 11 of the Wisconsin Constitution. Both provide that:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." United States Constitution Amendment IV; *see* Wisconsin Constitution, Article I, sec. 11.

categorization of cases subject to review by a single court of appeals judge, as opposed to a three-judge panel.[4] This dispute focuses on whether the defendant's unreasonable refusal to submit to a breathalyzer test pursuant to sec. 343.305(2)(a), Stats. 1977, falls within the purview of sec. 752.31(2)(c), Stats. 1977, authorizing a single-judge appeal in cases involving violations of traffic regulations. The state contends that the statutory penalty imposed for violation of a traffic regulation, as defined in sec. 345.20(1)(a), Stats. 1977, is a forfeiture. According to sec. 288.01, Stats. 1977, however, a forfeiture is defined as "any penalty, in money or goods" and the penalty pursuant to violating sec. 343.305, Stats. 1977 is a suspension of operating privileges. Consequently, the state argues that a suspension is not a forfeiture and therefore is not included within the parameters established in sec. 752.31(2), Stats. 1977. The defendant's timely notice of appeal conferring jurisdiction to the court of appeals vitiates the need to determine whether

---

[4] Section 752.31(1), (2), (3), Stats. 1977 provides:

"752.31 **Disposition of cases.** (1) Except as otherwise provided in this section, the court of appeals shall sit in panels of 3 judges to dispose of cases on their merits.

"(2) Appeals to the court of appeals in the following types of cases shall be heard as specified in sub. (3):

"(a) Cases under ch. 299.

"(b) Municipal ordinance violation cases.

"(c) Cases involving violations of traffic regulations, as defined in s. 345.20(1)(a).

"(d) Cases under ch. 51.

"(e) Cases under ch. 48.

"(f) Misdemeanors.

"(3) A case specified under sub. (2) shall be heard by one court of appeals judge, except that any party on appeal may move in writing to the chief judge of the court of appeals that the case be heard by a 3-judge panel. The chief judge may grant or deny the request ex parte. Any appeal which is heard by a single court of appeals judge shall be heard in the county where the case or action originated if any party so requests."

sec. 343.305(2)(a), Stats. 1977, is a traffic regulation. For if the court of appeals in its exercise of jurisdiction erroneously assigns this case to a single judge rather than to a panel, this alleged error, and we need not rule whether the court of appeals erred in this case, was waived when neither the state nor the defendant interposed a timely objection. Although resolving this issue is unnecessary in the present case, it is instructive to note that sec. 752.31(2)(c), Stats., 1979–1980, was recently amended to include license suspension "cases under sec. 343.305," thereby expressly incorporating these cases within the parameters of sec. 752.31(2)(c), authorizing a single judge appeal. See sec. 2, ch. 152, Laws of 1981 (effective March 31, 1982).

The factual sequence underlying this dispute can be summarized through the testimony of the sole witness, Randy Jablonic. On the evening of April 24, 1978, Jablonic, a University of Wisconsin rowing coach, was driving alone in his truck. It was raining. He noticed that the driver of the automobile ahead of him was experiencing difficulty in operating his vehicle. In addition to the automobile's erratic speed, it was moving from side to side, crossing into the opposing lane, barely missing a road sign, a median strip, and the oncoming traffic. The vehicle ultimately left the road entirely and drove into a field where it either became stuck or stalled.

Jablonic, concerned that the car might return to the road and fearful "[b]ecause I realized [he] would probably kill somebody" remained at the scene blocking the car to be certain that the car did not return to the highway. A motorist stopped and Jablonic requested her to alert the police. An officer arrived at the scene shortly thereafter.

Prior to the officer's arrival, however, the driver left the automobile in the field and approached Jablonic's truck. Jablonic testified that the driver asked him for a

ride home but Jablonic replied that they should wait for assistance in removing or repairing the car, rather than leaving it in the field. At this point the driver became alarmed and "broke into a very slurred conversation—'you wouldn't get your cops'—or something it was very insecure and not very controlled conversation." The driver then left Jablonic and headed back across the field abandoning the automobile and departing from the scene of the accident.

The police arrived "practically immediately upon, . . . his departure" and spoke with Jablonic who had remained at the scene. Jablonic responded to the officer's inquiry by describing his observations of the automobile and its driver. Jablonic told the officer that he believed that the driver "was very inebriated or very sick or not very much in possession of his faculties or ability to perform." When asked at trial what formed the basis of his opinion that the defendant was inebriated, he testified ". . . the erratic motion of the car, and then the staggering and slurred speech that [the driver] exhibited when he was trying to talk" constituted the basis upon which he formed his conclusion that the driver was intoxicated. He further described the driver's walk as unsteady and unsure. He stated that when he spoke with the driver at the roadside he had remained in his truck. Consequently, he declared that he had "no opportunity to smell the [driver's] breath." Jablonic further testified that he commonly "see[s] many inebriated people, unfortunately," demonstrating his familiarity with the symptons of intoxication. Although Jablonic stated that "he [the driver] was very inebriated or very sick or not very much in possession of his faculties or ability to perform," this statement, when considered within the context of the entire record, demonstrates the propriety of the trial judge's conclusion that Jablonic conveyed the definite impression that the driver was intoxicated. Jablonic's reference to

illness was merely a remote possibility which provided an alternative, more charitable explanation—illness—to account for his erratic driving, unsteady movements, and slurred speech. The record supports the trial judge's ruling that the officer had probable cause to believe that the driver was intoxicated.

At the scene of the accident the officer ran a license check to determine the vehicle owner's identity. Although the officer could not conclude that the owner of the abandoned automobile was necessarily its driver, he did correctly recall that he was involved in the arrest of the owner in an alcohol-related disturbance within two weeks prior to this accident. The officer's recollection was sufficiently pertinent to provide additional evidence to support the existence of probable cause.

Acting upon his collective knowledge of the situation, the officer proceeded immediately to the defendant's residence which was located near the scene of the accident. Attempting to confirm his belief that the defendant had, in fact, been driving his abandoned vehicle while under the influence of an intoxicant, the officer, arriving at the defendant's residence, asked the defendant's stepdaughter if the defendant was at home. The officer testified that she replied, he had "just stumbled in . . . ." "He is upstairs, and motioned that way—towards the stairs, allowing us to pass." Proceeding up the staircase, the officer encountered the defendant's wife. He testified that she asked:

" 'What is going on,' . . . again, we explained there had been an accident, . . . And we would like to speak with him because *we thought he was probably under the influence of an intoxicant.* And she, at that point, also gave her consent for us to go up, because she said, 'Yes, he is in bed. He just got into bed. And something has to be done,' referring to the fact that she recognized me from the earlier—I assumed she recognized me from the

earlier case, and was, I think, saying that she was concerned about his alcoholic problem. And she indicated, 'Something has to be done,' and motioned us to the bedroom." (Emphasis added).

Affirming the trial court's dual finding of probable cause and exigent circumstances vitiates the need to remand this case to the circuit court on the issue of consensual entry, as was ordered by the court of appeals.

The issue in the present case addresses the delicate interrelationship between the individual's right to privacy and the governmental responsibility to enforce the law in a manner which serves the public interest. To prevail in this case, the state must prove the co-existence of probable cause[5] and exigent circumstances, justifying the officer's conduct at the defendant's residence. We hold that there was ample evidence supporting the trial court's ruling that the officer's entry was justified on the basis of both probable cause and exigent circum-

[5] The arrest in the present case is statutorily authorized in sec. 345.22, Stats. 1977. This statute only requires probable or reasonable cause to effectuate a warrantless arrest.

Section 345.22, Stats. 1977, provides:

"345.22 **Authority to arrest without a warrant.** A person may be arrested without a warrant for the violation of a traffic regulation if the traffic officer has reasonable grounds to believe that the person is violating or has violated a traffic regulation."

The "reasonable grounds to believe" language in sec. 345.22 is synonomous with the constitutional standard of probable cause. *Johnson v. State,* 75 Wis. 2d 344, 348, 249 N.W.2d 593 (1977). Consequently, our reference to probable cause in the present case shall be interpreted as being used interchangeably with and meeting the statutory standard of "reasonable grounds to believe." Section 345.22, Stats. 1977.

Section 345.22 only requires probable cause in its authorization of a warrantless arrest for violation of a traffic regulation. The instant case, however, meets the statutory probable cause standard in addition to meeting the case law requirements of probable cause *coupled with exigent circumstances.*

stances. Entry to effect a warrantless arrest in a residence is subject to the limitations imposed by both the United States and the Wisconsin Constitutions. U.S. Const. amend. IV; Wis. Const. art. I, sec. 11. The individual's right to privacy in the home is a fundamental freedom protecting the individual from unreasonable governmental interference; however, this fundamental right is not absolute. It is subject to limited but well-established exceptions where the public interest requires that proper authorities may impinge upon the individual's right to privacy. In these instances of compelling public need, the government bears the burden of proving that the public interest supersedes the individual's right to privacy. Consequently, to insure the validity of a warrentless arrest, the state must prove probable cause, coupled with exigent circumstances. *E.g., Dunaway v. New York,* 442 U.S. 200 (1979) ; *Henry v. United States,* 361 U.S. 98, 102 (1959) ; *State v. Paszek,* 50 Wis. 2d 619, 184 N.W.2d 836 (1971) ; *see Payton v. New York,* 445 U.S. 573, 575, 583–88 (1980) [citing *Laasch v. State,* 84 Wis. 2d 587, 267 N.W.2d 278 (1978) ].[6]

[6] Both *Payton* and *Laasch* are Fourth Amendment cases, providing fundamental support for our position in the present case. *Payton v. New York,* 445 U.S. 573 (1980) ; *Laasch v. State,* 84 Wis. 2d 587, 267 N.W.2d 278 (1978). Although a cursory reading of *Payton* suggests that it is unconstitutional for police officers, having probable cause, to enter a private residence without a warrant, it is clearly distinguishable from the case at bar because, unlike the present case, *Payton* expressly disavows a finding of exigent circumstances. *Payton* states that,

"[a]lthough it is arguable that the warrantless entry to effect Payton's arrest might have been *justified by exigent circumstances,* none of the New York courts *relied on any such justification.* The [New York court] treated both Payton's and Riddick's cases as involving routine arrests in which *there was ample time to obtain a warrant,* and we will do the same. Accordingly, *we have no occasion to consider the sort of emergency or dangerous situation,*

This dual finding is subject to numerous and diverse interpretations. The common feature underlying all search and seizure interpretations, however, is the *reasonableness* of the government's intrusion when considered within the context of the totality of the circumstances. *See: State v. Cheers,* 102 Wis. 2d 367, 388, 306 N.W.2d 676 (1981) ; *Bies v. State,* 76 Wis. 2d 457, 468, 251 N.W.2d 461 (1977). The United States Supreme Court has addressed the concepts suggestive of analysis in determining the reasonableness of the governmental interference with the individual's Fourth Amendment rights. "Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas,* 443 U.S. 47, 50–51 (1979). Moreover " '[w]hether an inquiry is considered reasonable must depend upon the facts in each case and must turn on the application of what is essentially an indeterminate and flexible test.' " *Bies v. State,* 76 Wis. 2d at 466 [quoting

described in our cases as 'exigent circumstances,' that would justify a warrantless entry into a home for the purpose of either arrest or search." 445 U.S. at 583 (footnote omitted) (emphasis added).

Likewise, the defendant's warrantless arrest in *Laasch v. State* occurred absent a showing of exigent circumstances. In *Laasch,* the issue before this Court was "whether, in the *absence of any exigent circumstances,* a police officer may enter a suspect's home without consent in order to make a warrantless arrest." 84 Wis. 2d at 593 (emphasis added). Admittedly of less significance than the absence of exigency, the arresting officers in *Laasch* were arguably afforded ample time to obtain a warrant, as there was a thirteen-day interval between the defendant's offense and her arrest. *Id.* at 588–89.

Consequently, the time lapse and the absence of exigent circumstances in both *Payton* and *Laasch* limit their applicability to the present case. In this case, we hold that the existence of exigent circumstances contributes to our justification of Welsh's arrest.

*Browne v. State,* 24 Wis. 2d 491, 507, 129 N.W.2d 175 (1964)]. Although the State must prove the existence of both probable cause and exigent circumstances, negating any implication of adherence to a mere balancing test, the progeny of Fourth Amendment case law demonstrates that reasonableness occupies a prominent position in search and seizure analysis. Exigent circumstances and particularly probable cause, are not susceptible to stringently mechanical definitions. Frequently, case law has offered guidance through example rather than by definition. Consequently, the particularities and peculiarities of a given case are considered in the context of reasonableness. Accordingly, thorough analysis seeks to ascertain whether the case, in its entirety, while meeting the dual standards of probable cause and exigency, veritably accommodates this context of reasonableness.

## I.  *PROBABLE  CAUSE*

The probable cause standard required to arrest dictates that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed the offense. The evidence must show that there is more than a possibility or suspicion that the defendant committed the offense. The evidence need not reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not. *State v. Paszek,* 50 Wis. 2d at 624–25. In *State v. Paszek,* 50 Wis. 2d at 624–25, we described probable cause as follows :

"Probable cause to arrest refers to that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed a crime. It is not necessary that the evidence giving rise to such probable cause be sufficient to prove guilt beyond a reasonable doubt, nor must it be sufficient to prove that guilt is more probable than not. It is only necessary that the

information lead a reasonable officer to believe that guilt is more than a possibility, and it is well established that the belief may be predicated in part upon hearsay information. The quantum of information which constitutes probable cause to arrest must be measured by the facts of the particular case. Probable cause is defined in *Draper v. United States, supra,* p. 313, as:

" ' "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act." Probable cause exists where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. *Carroll v. United States,* 267 U.S. 132." ' " *State v. Paszek,* 50 Wis. 2d at 624–25 (citations omitted).

To effectuate a warrantless, nonconsensual entry into the residence, in addition to exigent circumstances the officers had to have probable cause to believe that the defendant had committed the offense of driving while under the influence of an intoxicant at the time they entered the home.

■
Examination of the record demonstrates the existence of probable cause, satisfying the first requisite of the two-pronged test necessary to justify the officer's warrantless entry and arrest of the defendant. In this case, the officer had a substantial amount of reliable information, indicating to a reasonable police officer that the defendant had probably violated the statute prohibiting driving while under the influence of an intoxicant. *See* secs. 345.22; 346.63(1), Stats. 1977.

■
Arriving at the scene of the accident the officer was met by Jablonic, the sole witness to the driver's conduct.

There is nothing in the record which challenges the reliability of either his observations or his statements to the officer. Adhering to the standard for reliability established in *State v. Cheers*, we held

" ' "that a valid arrest without a warrant may be made solely by reason of information communicated by a reliable informant. . . . A *citizen who* purports to be a victim of or to have *witnessed a crime is a reliable informant even though his reliability has not theretofore been proved or tested*. . . . The rationale underlying this principle is that such a person, as the observer of criminal activity, acts openly in aid of law enforcement when he reports the crime to the police." ' " 102 Wis. 2d at 395–96. (emphasis added) (emphasis in original omitted) [quoting *State v. Paszek*, 50 Wis. 2d at 631].

Consequently, Jablonic's information satisfies both prongs of the *Cheers* test for reliability.

In the *Cheers* case we discussed an additional " 'factor to be considered in determining whether probable cause exists,' " namely, that the defendant's "conduct and retreat or 'flight' from the police officers' show of authority immediately prior to the time of his arrest certainly constitutes evidence of consciousness of guilt." *State v. Cheers*, 102 Wis. 2d at 391. The defendant's statements, as well as his immediate retreat from the scene in fleeing to his home at the mention of police officers, clearly "constitutes evidence of consciousness of guilt" and is an additional factor buttressing our conclusion that the trial court properly found the existence of probable cause.

Jablonic told the officer at the scene of the accident that the officer had arrived "practically immediately upon [the driver's] departure." The officer's license check identified the owner of the vehicle. As we have noted, ownership does not necessarily indicate the driver's identity; however, the officer correctly recalled his involvement in the recent arrest of the owner in an al-

cohol-related dispute. Jablonic did not give a detailed description to the officer of the driver's physical features, but he did state that the driver was a man wearing wet clothing. This information, coupled with Jablonic's observations of the defendant's erratic driving patterns and his personal conduct, further supports the trial court's holding of probable cause.

Acting upon his collective knowledge of the situation, the officer proceeded immediately to the defendant's residence and was told that the defendant "had just stumbled in." While the officer, prior to his arrival at the house, had probable cause to believe that the defendant was the driver of the abandoned automobile, the defendant's stepdaughter's statement provided additional evidence in support of the proposition that the defendant was the driver because she said he had stumbled in only moments before the officer had arrived.

The word "stumbled" buttressed the witness's belief that the defendant was intoxicated. The fact that the defendant had just returned home on this rainy night supports the officer's belief that the defendant was the driver of his just abandoned car. The officer believed that he had probable cause, declaring that he "thought [the driver] was probably under the influence of an intoxicant."

Although the defendant contends that the officer proceeded to the residence to determine whether he had sufficient evidence to establish probable cause to enter and arrest the defendant, we do not find this contention persuasive. The officer, acting upon Jablonic's observations, coupled with his own accurate recollection of his involvement in the arrest of the defendant in a recent alcohol-related disturbance, had probable cause when he proceeded to the residence. The officer's conversation with the defendant's stepdaughter before entering the home provided further evidence establishing the existence of probable cause.

Scrutiny of the record, in its entirety, indicates that the officer had probable cause before he entered the defendant's residence. Although the officer may not have been absolutely certain that the defendant was driving while under the influence of an intoxicant, absolute certainty is not the standard employed in determining the existence of probable cause.

The officer's conversation with the defendant's stepdaughter before entering the home provided further evidence establishing the existence of probable cause. The officer testified that,

". . . it was my mental intent to go in the house and determine if he was in his bedroom, and what condition he was in, and whether or not he had anything to drink prior to leaving where the accident or the incident took place, until the time he got into bed. It was my intent to investigate it up to that point and make a determination."

The defendant argues that this statement demonstrates that the officer did not believe he had probable cause and was going to the defendant's bedroom solely to investigate. The officer's statement, when considered along with his declaration that the defendant "was probably under the influence of an intoxicant," demonstrates that the investigating statement is not being read by the defendant in the context of the entire record. The officer, correctly believing that he had probable cause, merely recognized that he was not absolutely positive that the defendant had been operating his automobile while under the influence of an intoxicant. The defendant could have been drinking after he returned to his home, thereby rendering the results of a blood alcohol test meaningless. Moreover, if the defendant had been ill, rather than intoxicated, the officer would have changed his original conclusion on which he had predicated the existence of probable cause. Consequently, the officer's statement merely acknowledged that he was not absolutely certain

that the defendant was driving while under the influence of an intoxicant, and prior to arresting the defendant, he was willing to reconsider his initial conclusion if necessary. A synthesis of these facts negates the possibility that the officer only had a mere suspicion that the defendant was driving while under the influence of an intoxicant in violation of sec. 346.63(1), Stats. 1977.

The foregoing evidence, when myopically parsed, may not individually support a finding of probable cause. When examined collectively, however, it unquestionably indicates "that quantum of evidence which would lead a reasonable police officer to believe that the defendant [driver] probably [violated the statute prohibiting driving while under the influence of an intoxicant]."[7] *State v. Cheers,* 102 Wis. 2d at 386; *see Henry v. United States, supra;* secs. 345.22 and 346.63(1), Stats. 1977. The evidence in this case clearly demonstrates that the trial court was correct in ruling that the state had met its burden.

In considering the governmental interest, it is appropriate to note that driving under the influence is a pervasive problem of substantial proportion. In Wisconsin in 1981, there was a 5 percent increase in drunken driving convictions from 1980.[8] Further, approximately 50 per-

---

[7] Consequently, *Welsh* meets the probable cause standard articulated in both the majority and dissenting opinions in *State v. Cheers,* 102 Wis. 2d 367, 386, 306 N.W.2d 676 (1981); *Id.* at 406, 408 (Abrahamson, J., dissenting).

[8] Wisconsin Department of Transportation figures show that in 1981 there were 32,506 convictions for drunken driving. Drunken driving statistics covering years prior to 1981 have been published in annual reports entitled, Anderson, *Wisconsin Accident Facts* (prepared by the Traffic Accident Data Section of the Division of Motor Vehicles, Department of Transportation [hereinafter *Wisconsin Accident Facts*]).

In Wisconsin in 1980, there were 30,409 convictions for drunken driving. *Wisconsin Accident Facts* 16–17 (1980).

cent of all drivers killed in Wisconsin were driving while legally intoxicated.[9] The increasing number of fatalities caused by drunken drivers has aroused state legislatures to adopt stricter penalties in the forms of substantial fines, imprisonment, and license suspensions to punish those who violate the laws prohibiting driving while under the influence of an intoxicant.[10]

[9] In 1980, 583 drivers were killed. Of these drivers, 470 were tested for blood alcohol content, and 269 were found to be legally intoxicated, having a minimum blood alcohol content of .10 percent. *Wisconsin Accident Facts* 1 (1981). Similarly in 1978, 576 drivers were killed; while 226 of the 448 tested were found to be legally intoxicated. *Wisconsin Accident Facts* 1 (1979).

[10] Sec. 967.055, Stats., created by Chapter 20, Laws of 1981, provides:

"Sec. 967.055 **Dismissing or amending charges; operating a motor vehicle, intoxicant or controlled substance.** (1) INTENT. The legislature intends to encourage the vigorous prosecution of offenses concerning the operation of motor vehicles by persons under the influence of an intoxicant, or a controlled substance or both.

"(2) DISMISSING OR AMENDING CHARGE. Notwithstanding s. 971.29, if the prosecutor seeks to dismiss or amend a charge under s. 346.63(1) or a local ordinance in conformity therewith, or s. 346.63(2) or 940.25 or s. 940.09 where the offense involved the use of a vehicle or an improper refusal under s. 343.305, the prosecutor shall apply to the court. The application shall state the reasons for the proposed amendment or dismissal. The court may approve the application only if the court finds that the proposed amendment or dismissal is consistent with the public's interest in deterring the operation of motor vehicles by persons who are under the influence of an intoxicant or both."

*See* Hammer, *The New OMVWI Law: Wisconsin Changes Its Approach to the Problem of Drinking and Driving*, 55 Wis. B. Bull. 9 (April, 1982); *e.g.*, sec. 346.63(1), Stats., repealed and recreated by Chapter 20, Laws of 1981; sec. 346.65(2), Stats., repealed and recreated by Chapter 20, Laws of 1981; *see also* Hammer, *The New OMVWI Law: Wisconsin Changes Its Approach to the Problem of Drinking and Driving*, 55 Wis. B. Bull. 15, 17 (May, 1982).

## II. *EXIGENT CIRCUMSTANCES*

In addition to the existence of probable cause, accompanying proof of exigent circumstances must be shown in order to justify this warrantless entry. Proof of exigency vitiates the need for a warrant under those circumstances when obtaining a warrant could frustrate the arrest. An analysis of the facts demonstrates that, in this case, exigent circumstances justified this officer's warrantless entry to effect the arrest of the defendant.

Frequently, proof that the officer is in hot pursuit of the suspect constitutes exigency. The hot pursuit doctrine evolved to encompass situations where time was of the essence. In other words, when requiring the police to obtain a warrant would constitute undue delay, the hot pursuit doctrine is applicable. In this case, time was of the essence. The inherent nature of the offense demanded the suspect's immediate apprehension to accommodate the dictates of the blood alcohol test statute. Section 343.305(2)(a), Stats. 1977. In order for the officer to enforce the statutory requisites, the situation demanded his immediate search for and pursuit of the suspect.

The defendant, fearful of the officer's impending arrival and perhaps recognizing the possibility of being requested to submit to a blood alcohol test, left the scene of the accident upon discovering that the officer had been summoned. Fleeing to his home, in an attempt to avoid a confrontation with the officer, the defendant's hasty departure resulted in the abandonment of his car. If the officer had retreated and sought to obtain a warrant, rather than immediately pursuing and arresting the suspect, the requirements of the blood alcohol statutes would have been frustrated.

The imminent threat to safety doctrine also constitutes exigent circumstances. The sole purpose of the blood al-

cohol test is to facilitate prosecution of those driving while under the influence of an intoxicant. *See* sec. 343.-305(2)(a) and 346.63(1), Stats. 1977. Further, sec. 345.24, Stats. 1977, provides that a person arrested for driving while under the influence of an intoxicant "may not be released until four hours have elapsed."[11] This severe treatment is dramatic evidence of the legislature's intent and recognition of the need to protect the public from drunken drivers. Undoubtedly, this provision was enacted to prevent drunken drivers from returning to the road while intoxicated. Presumably, this four-hour statutory limitation sought to provide an adequate time allowance for the arrested intoxicant's blood alcohol content to metabolize to a safer level, equal to or less than .05 percent. Restraining those drivers who pose a danger to themselves and the public for the four-hour statutory period constitutes a preventive measure, designed to promote public safety.

The officer concluded that he had probable cause to believe that the defendant had been operating a motor vehicle while under the influence of an intoxicant. Accordingly, the situation demanded the officer's prompt attempt to locate the defendant. An arrest would prevent the driver from returning to his, or another automobile, where he could have continued to drive in his current state, posing a danger to himself and the public. Consequently, the nature of this offense, coupled with the po-

---

[11] Section 345.24, Stats. 1977, provides in its entirety:

"345.24 **Officer's action after arrest for driving under influence of intoxicant.** A person arrested under s. 346.63 or an ordinance in conformity therewith for operating a motor vehicle while under the influence of an intoxicant may not be released until 4 hours have elapsed from the time of his or her arrest or unless a chemical test administered under s. 343.305(2)(b) shows that there is .05% or less by weight of alcohol in the person's blood, but the person may be released to his or her attorney, spouse, relative or other responsible adult at any time after arrest."

tential threat to the public safety, satisfied the exigent circumstances test pursuant to the imminent threat to safety doctrine.

An equally persuasive argument is the probable destruction of evidence. This is a model case demonstrating the urgency involved in arresting the suspect in order to preserve evidence of the statutory violation. "Sometimes the nature of the evidence will be such that it will soon disappear of its own accord." 2 W. LaFave, *Search and Seizure,* sec. 6.5 at 448 (1978). "Blood rapidly metabolizes alcohol after a person ceases drinking; thus creating an exigent situation." *State v. Bentley,* 92 Wis. 2d 860, 864, 286 N.W.2d 153 (Ct. App. 1979). Without an immediate blood alcohol test, highly reliable and persuasive evidence facilitating the state's proof of the defendant's alleged violation of sec. 346.63(1), Stats. 1977, would be destroyed. *See* sec. 343.305(2)(a), Stats. 1977. Accordingly, the facts of this case adhere to the presumption favoring warrantless arrests which are a result "of an ongoing investigation in the field," rather than an arrest that had been planned. W. LaFave, *supra,* sec. 6.1 at 391.[12]

---

[12] Professor LaFave, a preeminent authority on the Fourth Amendment, distinguished a finding of exigency in cases involving planned arrests as opposed to those relating to an ongoing investigation in the field:

"A 'planned' arrest is one which is made after a criminal investigation has been fully completed at another location and the police make a deliberate decision to go to a certain place, either the arrestee's home or some other premises where he is believed to be, in order to take him into custody. . . . Courts have understandably been reluctant to accept police claims of exigent circumstances in these situations, for it ordinarily appears that whatever exigencies thereafter arose were foreseeable at the time the arrest decision was made, when a warrant could have readily been obtained." W. LaFave, *supra,* sec. 6.1 at 391.

"On the other hand, when the occasion for arrest arises while the police are already out in the field investigating the prior or

In summary, we conclude that this situation did not afford the officer ample time in which to obtain a warrant. Further, the record demonstrates that the officer's conduct was reasonable within the context of the surrounding circumstances. Accordingly, we affirm the circuit court's holding, finding the existence of both probable cause and exigent circumstances in the present case.

*By the Court.*—The decision of the court of appeals is reversed.

CECI, J., took no part.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). As a result of the decision in this case, if a witness reports to the police that:

(1) a few moments ago, on this dark, rainy night he saw a car being driven erratically into a field;

(2) he observed and spoke with the driver of the car but does not know the name of the driver;

(3) the driver staggered and had slurred speech but that the witness had no opportunity to smell any alcohol on the driver's breath;

(4) the driver was either very inebriated or very sick; and

(5) there was no damage to any person or any property;

then the police officers, relying on a statute allowing an officer to arrest a person without a warrant for violating a civil traffic regulation (a civil, not a criminal offense)

---

ongoing conduct which is the basis for the arrest, there should be a far greater reluctance to fault the police for not having an arrest warrant. Here, *the presumption should be in favor of a warrantless arrest rather than against it,* as the probabilities are high that it is not feasible for the police to delay the arrest while one of their number leaves the area, finds a magistrate and obtains a warrant, and then returns with it." *Id.* at 392 (emphasis added) (footnote omitted).

committed outside his presence, after checking to find that the title to the car is in your name, may, without your consent and without having a search warrant or arrest warrant issued by a judicial officer:

(1) go to your home at night;

(2) enter your home;

(3) climb the stairs to your second-floor bedroom;

(4) look around your bedroom to see if the clothes . you took off match the description of the clothes worn by the driver of the car; and

(5) ask you, as you lie naked in your bed, to get out of bed so that the officers can determine whether you are intoxicated.

I dissent because I conclude that this warrantless invasion into your privacy in your home to investigate whether you violated a civil traffic statute contravenes sec. 11, Art. I, of the Wisconsin constitution and the fourth amendment to the federal constitution which guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. . . ."

The essence of the fourth amendment is that a judicial officer with the power to issue a warrant, not a policeman or government agent, decides whether the government can enter your home without your consent. As Justice Jackson so eloquently stated:

"Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Johnson v. United States,* 333 U.S. 10, 14 (1948).

In a free society a warrant provides fourth amendment protection (1) by substituting the judgment of a judicial officer for that of the police officer; (2) by preventing hindsight from coloring the determination of probable cause; and (3) by providing the person subject to the arrest with assurance that the police officer is acting within lawful authority. *United States v. Martinez-Fuerte,* 428 U.S. 543, 565–66 (1976). Under our constitution a warrantless arrest is unreasonable except in a few "jealously and carefully drawn" exceptional circumstances. *Jones v. United States,* 357 U.S. 493, 499 (1958).

In our country a warrantless entry into a home by a police officer is presumed unreasonable, because our society recognizes the special sanctity of the home. In *Payton v. New York,* 445 U.S. 573, 585–86 (1980), the United States Supreme Court clearly proclaimed that the " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,' " and that "it is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." It is only when "exigencies of the situation . . . make warrantless entry *imperative*" that warrantless entry into a person's home may be condoned. *Laasch v. State,* 84 Wis. 2d 587, 594, 267 N.W.2d 278 (1978). (Emphasis added.)

I dissent because I conclude that the warrantless intrusion into the defendant's home in the instant case is unconstitutional. First, I have grave doubts as to the constitutionality of sec. 345.22, Stats. 1977, authorizing a warrantless arrest for violation of a civil traffic offense committed outside the officer's presence. Absent sec. 345.22 the officer has no statutory or common law authority to arrest the defendant without a warrant. Second, assuming arguendo that a police officer has authority to arrest the defendant without a warrant for vio-

lation of a civil traffic offense committed outside the officer's presence if the officer had reasonable grounds to believe that the person violated a traffic regulation, the facts in this record do not support the majority's conclusion that the officer had probable cause to believe that the defendant committed the civil offense of operating a motor vehicle while intoxicated. Third, the facts do not justify the legal conclusion that the circumstances were exigent, making the warrantless entry into the defendant's home "imperative." *Laasch v. State, supra,* 84 Wis. 2d at 594.

*Arrest for a Civil Offense.* In contrast to the cases cited and relied upon by the majority to justify a warrantless entry into the defendant's home, this case does not involve a warrantless arrest for a felony. This case does not involve a warrantless arrest for a misdemeanor. This case does not even involve a warrantless arrest for the violation of a civil traffic statute committed in the presence of an officer. This case involves a warrantless arrest for the violation of a civil traffic statute committed outside the presence of an officer.

The majority concludes that the officer's power to arrest is predicated on sec. 345.22, Stats. 1977, which states:

"345.22 **Authority to arrest without a warrant.** A person may be arrested without a warrant for the violation of a traffic regulation if the traffic officer has reasonable grounds to believe that the person is violating or has violated a traffic regulation."[1]

---

[1] Both the defendant and the state initially treated this case as if the defendant was accused of violating a criminal statute and not a civil statute. The court of appeals decision stated that the case involved a misdemeanor yet there is no proof in the record that the defendant was involved in a crime. A first violation of sec. 346.63(1) is a civil forfeiture; a second or subsequent violation within the statutory time period is a crime. Sec. 346.65(2)(a)1, 2. The state in its briefs referred to the officer's power to arrest under sec. 968.07(1)(d), Stats. 1979–80, the criminal arrest

Sec. 345.22 is a departure from the common law doctrine of arrest and from the long-standing rules of arrest in Wisconsin. The statute was enacted in 1971. The long-standing Wisconsin rules of arrest allowed an officer to make a warrantless arrest if the officer had probable cause to believe the person was committing or had committed a felony or to believe the person was committing or had committed a misdemeanor or an ordinance violation. The officer could not, however, make a warrantless arrest if the misdemeanor or ordinance violation was not committed in the officer's presence unless other factors existed. Sec. 954.03, Stats. 1967. The common law, in contrast to the Wisconsin law, was more restrictive as to the officer's power to make a warrantless arrest for a misdemeanor. At common law the arrest was permissible only if the misdemeanor was committed in the presence of the officer and constituted a breach of the peace. *State v. Smith,* 50 Wis. 2d 460, 469, 472, 184 N.W.2d 889 (1971).

The validity of sec. 345.22, which authorizes a warrantless arrest for violation of a civil statute when the violation was committed outside the presence of the officer cannot be assumed. The constitutionality of a warrantless arrest for a *felony* committed outside the presence of an officer was not settled until 1976, and then by a divided United States Supreme Court. In *United States v. Watson,* 423 U.S. 411 (1976), the Court declared constitutional a daytime warrantless arrest in a public place for a felony committed outside the presence of the

statute. For other arrest provisions see sec. 62.09(13) and ch. 818, Stats. 1979–80.

When the defendant made the point that the offense here is civil, the state agreed that there is no indication that the offense is criminal. The state in its final brief argues that because the defendant did not raise the question of whether the offense here indeed was a crime, that issue has been waived. I conclude that, regardless of the issue of waiver, the validity of sec. 345.22 is an important issue for this case and law enforcement, and we should under our discretionary powers reach it.

officer. The Court upheld the warrantless felony arrest in that case, reasoning that such an arrest is based on accepted common law doctrine of arrest and that if felony arrests were permissible only with a warrant or only in exigent circumstances effective criminal law enforcement would be significantly handicapped. The reasoning of the *Watson* case cannot be applied to uphold sec. 345.-22. I cannot find that the common law allowed a warrantless arrest for the violation of a civil statute committed outside the presence of an officer. The police apparently have the authority to issue a traffic citation to a person who violated a traffic law ordering the person to present himself at court at a certain time. If we conclude that the police officer must get a warrant to arrest such a person, the effective enforcement of the traffic law will not be significantly handicapped and the constitutional protection of the sanctity of the home will be enhanced.

I have found no cases, and the majority cites none, upholding a warrantless arrest, either in a public place or in a home, for a civil traffic offense committed outside the presence of the officer. All the cases and commentary cited by the majority address the question of the validity of an arrest for a violation of a criminal statute. In *Camara v. Municipal Court,* 387 U.S. 523, 540 (1967), the Court concluded that in the absence of compelling urgency a warrantless administrative public health search of a home violates the fourteenth amendment. Neither the defendant nor the state discusses the question of the validity of sec. 345.22. Because the validity of sec. 345.22 is of significance to traffic law enforcement in general, I would ask the parties for further briefing on this question.

At this stage, however, I wish to express my doubts about the constitutionality of sec. 345.22, Stats. 1977, to the extent that it authorizes a warrantless arrest on

probable cause for a civil traffic offense committed outside the presence of an officer. Requiring a warrant in civil traffic cases would protect the privacy of the individual guaranteed by the constitution and would not unduly burden law enforcement. If there are exceptions to the warrant requirement in civil traffic cases, these have to be defined.

Assuming arguendo that the law applicable to warrantless felony arrests can be applied without change to warrantless arrests for civil traffic offenses committed outside the presence of a police officer, I conclude there was no probable cause or exigent circumstances.

*Probable Cause.* In reviewing the decision of the circuit court as to probable cause, this court will not overturn findings of fact unless against the great weight and clear preponderance of the evidence, but this court will independently examine the record to make its own determination of the legal question, namely, whether the constitutional requirement of probable cause is satisfied.

The circuit court in this case stated its decision from the bench. The circuit court merely concluded that "the police did have probable cause to believe that the defendant had committed the offense of operating while under the influence." The circuit court did not make any findings of fact, did not make any analysis or summary of the evidence, and did not analyze the legal principles it used to reach its legal conclusion.

There are disputed facts in this case and the credibility of witnesses is at issue. Generally where the circuit court does not expressly make a finding necessary to support its legal conclusion, this court can assume that the circuit court made the finding in the way that supports its decision. *Sohns v. Jensen,* 11 Wis. 2d 449, 453, 105 N.W.2d 818 (1960). See also *State v. Fillyaw,* 104 Wis. 2d 700, 727–28, 312 N.W.2d 795 (1981) (Abrahamson, J., concurring). The majority's de novo review of the record must therefore be to determine the legal signifi-

cance of the facts, not to decide the disputed facts and the credibility of witnesses.

When an arrest is made without a warrant the state bears the burden of proving the existence of probable cause. *Leroux v. State,* 58 Wis. 2d 671, 682, 207 N.W.2d 589 (1973). In the case at bar a determination by this court of the legal question of probable cause to believe that the defendant was driving while under the influence of an intoxicant turns on three pieces of information known to the officer making the arrest.

The first piece of information is the ownership of the car. This information is relied upon to establish that it is probable that the defendant was the driver of the car. Jablonic did not describe the driver sufficiently for the officer to be able to identify the defendant as the driver. The officer had to reason that because the defendant was the owner of the car, he was probably the driver.

The second piece of information on which the determination of probable cause turns is that the defendant had been arrested previously in an alcohol-related disturbance. This information is relied upon to establish that the defendant was probably intoxicated. There is no indication in the record as to the nature of the alcohol-related disturbance; as to whom, if anyone, was intoxicated during this alcohol-related disturbance; as to the nature of the offense for which the defendant was previously arrested; whether there was any finding of probable cause for the arrest; or whether any further civil or criminal proceedings against the defendant resulted from the arrest. The majority opinion says that the officer "did *correctly* recall" the arrest. (Emphasis added.) *Supra,* p. 325. See also *supra,* pp. 331, 332 where the majority states that the officer's recollection was accurate and correct. There is nothing in the record which indicates whether the officer's recollec-

tion about the previous arrest of the defendant is correct or incorrect.

I need not reach the question of when a defendant's previous arrest may be relevant and probative in determining probable cause. In the case at bar the officer's testimony as to the defendant's prior arrest is so sketchy and subject to so many interpretations that neither the circuit court nor this court can use the information about the arrest to help form its independent determination whether the facts in the possession of the officer are as a matter of law sufficient to constitute probable cause.

The third, and most important, and perhaps the only piece of information on which the determination of probable cause turns, is Jablonic's statement to the officer. This information is relied upon to establish that the driver was probably intoxicated. The critical element in determining probable cause in the case at bar is whether the information which Jablonic, a reliable eyewitness, gave the police officer is sufficient to lead a reasonable police officer to believe that the driver was probably driving under the influence of an intoxicant.

Jablonic, the only person available with first-hand information about the driver and his driving, testified that the driver was walking and speaking with difficulty and that he was either intoxicated or sick. Even though, as he testified, he was familiar with the signs of intoxication, Jablonic had good reason to be uncertain. The weather was bad, and visibility was poor. Further, Jablonic was not able to verify or discard his intoxication theory because he did not have the opportunity to smell any alcohol when the driver spoke to him and asked him for a ride. I acknowledge that the mere fact that an innocent explanation for the driver's conduct, that is, illness, may be imagined is not enough to defeat probable cause. 1 LaFave, *Search and Seizure*, sec. 3.2(e), pp. 483–84 (1978). But in this case the innocent explana-

tion for the driver's conduct is not imagined; the innocent explanation is provided by the only witness, and it is provided as a real possibility.[2] The majority, without explanation and without any basis in the record, characterizes Jablonic's reference to illness as "merely a remote possibility which provided an alternative, more charitable explanation." *Supra,* p. 325.

The officer's testimony of what Jablonic told him is inconsistent with Jablonic's testimony. The officer testified that Jablonic had a definite opinion that the driver

---

[2] Jablonic's entire testimony as to what he told the police officer concerning the driver's condition is as follows:

"*Q.* What did you tell the officer? Did you give the officer a description of the individual you had been talking to?

"*A.* I don't recall that I did at the time. I told him that I felt the man was very inebriated or very sick or not very much in possession of his faculties or ability to perform. And it was my feeling that he had taken off across the field.

"*Q.* What did you base your opinion on that he was inebriated?

"*A.* Well, first of all the erratic motion of the car, and then the staggering and slurred speech that he exhibited when he was trying to talk to me.

"*Q.* You have seen people or persons under the influence of an intoxicant before?

"*A.* Working at the University, it's a common—very common to see many inebriated people, unfortunately."

Jablonic described the driver as follows:

"*Q.* Did you notice anything about this person?

"*A.* They had a kind of a wet leather jacket on or something that looked like a reddish-brown jacket, as what I can recall. It was evening. It was raining and wet. It might have been even a sportcoat that was just wet. And they stood by the window of the car, which I rolled down.

"*Q.* All right, did you have an opportunity to observe the way this person walked?

"*A.* It was very unsteady and unsure. And—the person that just wasn't very well would walk like that.

"*Q.* And did you—did this person get close enough to you that you could observe his breath?

was intoxicated.[3] Other aspects of the officer's testimony, however, indicate that Jablonic had conveyed his uncertainty to the officer as to whether or not the driver was intoxicated. The officer's own testimony indicates that he went to the defendant's residence to investigate the defendant's condition, not to arrest the defendant. Thus in response to the question as to what was the officer's "mental intent, when you went into the house, to have him arrested for drunken driving," the officer answered,

"Well, it was my mental intent to go in the house and determine if he was in his bedroom, and what condition he was in, and whether or not he had anything to drink prior to leaving where the accident or the incident took place, until the time he got into bed. It was my intent to investigate it up to that point and make a determination."

It was only after making the warrantless entry into the home, observing the defendant "wringing wet," seeing in the bedroom defendant's clothes which matched the clothes Jablonic described and smelling alcohol that the officer himself concluded he had sufficient information to lead him to believe that the defendant probably committed the offense of driving while under the influence of an intoxicant and decided to arrest the defendant.

Although the majority states that the circuit court reached "the conclusion that Jablonic conveyed the definite impression that the driver was intoxicated" (*supra,*

---

"*A.* No. They remained outside the vehicle. I did roll down the window. I conversed with the person. But there was no opportunity to smell his breath."

[3] Officer Daley testified as to his conversation with Jablonic as follows:

"*Q.* Do you recall whether or not he [Jablonic] said anything about this individual being under the influence?

"*A.* Yes, he had a definite opinion about that.

"*Q.* What did he tell you?

"*A.* He said the man was very obviously intoxicated."

p. 324), nowhere in the record did the circuit court state such a conclusion or even hint it reached such a conclusion. The circuit court's only reference to Jablonic's testimony is a reference by the circuit court to its notes which quote Jablonic as telling the officer that the driver was either sick or intoxicated. If any conclusion of the circuit court might be gleaned from the record as to the circuit court's finding of credibility as to Jablonic's or the officer's version of what Jablonic told the officer, and I do not know that any can be, it is that the circuit court relying on its notes concluded that Jablonic offered two explanations to the police officer for the driver's conduct—intoxication and illness. The most appropriate construction of the record is, however, that the circuit court concluded that it need not decide which witness to believe because whichever witness it believed the evidence was adequate to establish probable cause.

The majority seeks to bolster its conclusion that the officer had probable cause by relying on the officer's testimony as to what the daughter and the wife said when the officer entered the house. The daughter was not present to testify. The wife, without objection, related the daughter's version of what had happened, and the wife's testimony contradicts the officer's. The circuit court expressly avoided having to determine whose testimony it believed, the wife's or the officer's, and therefore the majority cannot use the officer's disputed testimony to bolster its conclusion.

Although the subjective conclusions of the police officer concerning the existence of or lack of existence of probable cause do not bind a court, the officer's apparent decision in the case at bar that the eyewitness furnished information sufficient to warrant further investigation but did not furnish information sufficient to lead him to believe that the defendant probably committed the offense of driving while under the influence of an intoxicant has some weight in this court's independent determination

of whether the information relayed to the officer was sufficient. Instead of saying that he intended to arrest the defendant but that he would have refrained from making the arrest if he found that the defendant was not intoxicated, the officer concluded on the record that it was his "intent to investigate . . . and make a determination." The majority cannot, try as it will, change the officer's words.

On the basis of the record in this case, I conclude that the state did not present sufficient facts to prove that information in the officer's possession was sufficient to satisfy the constitutional standard of probable cause. I conclude that when the officers entered the residence, they could only suspect that the defendant may have been the driver and that the driver may have been under the influence of an intoxicant. Reasonable suspicion (that is, ample factual justification falling short of what is required to support arrest or search) may be sufficient to justify further investigation, and in some situations, to justify a stop but it is not sufficient to justify a warrantless arrest. *Brown v. Texas,* 443 US 47, 51 (1979) ; *Terry v. Ohio,* 392 US 1, 22 (1968) ; *Wong Sun v. United States,* 371 US 471, 479 (1963) ; *State v. Cheers,* 102 Wis. 2d 367, 386–87, 306 N.W.2d 676 (1981) ; *Bies v. State,* 76 Wis. 2d 457, 465–66, 251 N.W.2d 461 (1977).

The majority opinion, in the section entitled probable cause, discusses the government's interest in eradicating drunk driving. *Supra,* pp. 333–335. The relevance of this discussion is not readily apparent. First, granting the police the power that the majority does in this case "does not appear sufficiently productive to qualify as a reasonable law enforcement practice under the Fourth Amendment." *Delaware v. Prouse,* 440 U.S. 648, 660 (1979). The contribution to highway safety of allowing warrantless arrests in the home of persons who are reported to have driven erratically and who are described as drunk

or sick and who caused no damage to property or person is marginal at best.

Second, if the police officer had probable cause to make the arrest, the government's interest and the seriousness of the offense are irrelevant. If the police officer did not have probable cause to arrest, the arrest is unconstitutional and the government's interest and the relative seriousness of the offense are irrelevant. If the majority's discussion of the government's interest is the majority's way of saying that the seriousness of the offense is a factor for the police and the courts to consider in determining probable cause, the majority is making a dramatic change in the law of probable cause and is establishing a balancing, sliding scale test that would be difficult for both police and courts to comprehend and apply. 1 LaFave, *Search and Seizure*, sec. 3.2(a), pp. 450–58 (1978).[4]

---

[4] In determining probable cause there is no balance or weighing of the gravity of the public concerns served by the arrest and the severity of the interference with individual liberty. The balance has been made by adopting the requirement of probable cause. As the United States Supreme Court has said, "The requisite 'balance' has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause." *Dunaway v. New York*, 442 U.S. 200, 214 (1979).

The majority at one and the same time appears to negate and to inject a balancing test in determining probable cause. The majority says at *supra*, p. 329 that "although the State must prove the existence of both probable cause and exigent circumstances, *negating any implication of adherence to a mere balancing test*, the progeny of Fourth Amendment case law demonstrates that reasonableness occupies a prominent position in search and seizure analysis." (Emphasis supplied.) The progeny to which the majority refers are *Brown v. Texas*, 443 U.S. 47, 50–51 (1979), and *Bies v. State*, 76 Wis. 2d 457, 466, 251 N.W.2d 461 (1976) (quoting *Browne v. State*, 24 Wis. 2d 491, 507, 129 N.W.2d 175 [1964] cert. denied. 379 U.S. 1004). These cases involve an investigation or a stop which requires something less than probable cause. An investigation and a stop may be justified even if there

*Exigent circumstances.* Even if there is probable cause to believe the defendant has committed a *felony,* a warrant is required to enter a home unless exceptional circumstances are present which justify a warrantless entry. *United States v. Johnson,* —— U.S. —— (June 21, 1982); *Payton v. New York,* 445 U.S. 573 (1980); *Laasch v. State,* 84 Wis.2d 587, 267 N.W.2d 278 (1978). *Payton* and *Laasch,* upon which the majority relies, are authority only for the proposition that a warrantless arrest in a home may be permissible under exigent circumstances if the officer has probable cause to believe a *felony* has been committed. These cases are not authority for a rule that a warrantless arrest can be made in a home under exigent circumstances if the crime is a misdemeanor or if the offense is a civil traffic offense. The majority cannot assume that the *Payton* and *Laasch* rule is automatically applicable to this case. The issue which must be decided, not assumed, is under what circumstances, if any, is a warrantless entry in a home at night to effect an arrest for violation of a civil statute constitutional? Does the government's interest in enforcing the civil law and collecting a forfeiture ever

is no probable cause as long as there is "mere 'reasonable suspicion.' " *Dunaway v. New York,* 442 U.S. 200, 211 (1979). Reasonableness in the probable cause context revolves around whether the officer has *reasonable* grounds to believe that the defendant probably committed a crime. Reasonableness in the context of an investigation or stop involves balancing the gravity of the state's interest and the nature of the invasion of the privacy of the person. The majority's shifting back and forth between the balancing test justifying an investigation or stop and the concept of probable cause justifying a search or an arrest may very well explain why the majority reaches the conclusion it did in this case that the intrusion in the defendant's home and his arrest were constitutional.

The court of appeals used a balancing test in this case to determine exigency, not to determine probable cause. See note 5 *infra.*

outweigh an individual's expectation of privacy in his or her home?

Even if I were to assume that the *Payton-Laasch* rule is automatically applicable to this civil forfeiture case, I conclude the record is not adequate to find exigent circumstances.

The exigent circumstances doctrine, like all exceptions to the warrant requirement, must be viewed as a narrow exception to the protections of the fourth amendment. In *McDonald v. United States,* 335 U.S. 451, 456 (1948), the Court said: "We cannot . . . excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that cause *imperative.*" (Emphasis added.) See also *Laasch v. State,* quoted *supra* at page 341 of this dissent.

Although the United States Supreme Court has on several occasions spoken of exigent circumstances, the Court has not clearly defined what are exigent circumstances or established standards to measure the existence of such exigent circumstances. In this case, the circuit court appeared to conclude that the exigency arose out of hot pursuit and the need to preserve evidence of intoxication. The majority, on the other hand, identifies three exigent circumstances, that is, three urgent circumstances that make resort to the warrant process impracticable: (1) the need to prevent the offender's escape (hot pursuit); (2) the need to prevent physical harm to the offender and the public; and (3) the need to prevent the destruction of evidence.

The majority opinion does not establish standards by which the existence of the exigent circumstances are to be tested. For example, the majority does not explain whether the test for a valid warrantless entry under the exigent circumstances doctrine is a subjective one, an objective one, or both. In *State v. Prober,* 98 Wis. 2d

345, 365, 297 N.W.2d 1 (1980), the court adopted a two-step analysis (subjective and objective) for application of the emergency doctrine, an exception to the warrant requirement which is similar to the exigent circumstances doctrine. Under *Prober,* the warrantless search is invalid unless the officer is actually motivated by the perceived emergency, that is, to render aid or assistance (subjective test). Second, "even though the requisite motivation is found to exist," the warrantless search is invalid unless a "reasonable person under the circumstances would have thought an emergency existed" (objective test).

If the *Prober* two-step analysis for the emergency doctrine is not applicable to the exigent circumstances doctrine the majority ought to tell us why.

This case cannot meet the *Prober* subjective test. The officer did not testify that he believed he had to arrest the defendant immediately in order to prevent the defendant from escaping or in order to protect the defendant or the public from the danger of the defendant driving another automobile that night. The officer does refer to the fact that alcohol dissipates with the passage of time. But the officer said that his subjective motivation was to investigate immediately, to determine if the defendant was drunk. The officer did not testify that he believed he had to arrest the defendant immediately to preserve the evidence. He said he went into the house to determine whether the defendant was drunk and if so he would then attempt to preserve the evidence.

This case also cannot meet the *Prober* objective test of exigent circumstances.[5] The essence of the exigent cir-

---

[5] In applying the objective standard, federal and state courts have, according to the commentators, taken one of two approaches in attempting to articulate the facts which bear on the determination of exigent circumstances: the checklist approach articulated in *Dorman v. United States*, 435 F.2d 385 (D.C. Cir. 1970) (en

cumstances doctrine is the degree of urgency to make the arrest or search created by the exigency and the amount of time it would take to obtain a warrant.

The warrantless entry in this case cannot be justified as necessary to prevent the defendant from escaping arrest or to prevent physical harm to the driver or to the public. The police had the defendant's name and address. There is nothing in the record to indicate that the police thought he would leave the jurisdiction or would not be available for arrest unless he was pursued and arrested immediately. The majority speculates, without anything in the record supporting this speculation, that the defendant (whose car was in the field and who, as the police officers found out when they knocked on the door, was in

banc) or the totality of the circumstances test. See Harbaugh and Faust, *"Knock on Any Door"—Home Arrests after Payton and Steagald*, 86 Dick. L. Rev. 191, 224–25 (1982); Donnino and Girese, *Exigent Circumstances for a Warrantless Home Arrest*, 45 Alb. L. Rev. 90 (1980); 2 LaFave, *Search and Seizure*, sec. 6.1, pp. 388–95 (1978).

Judge Gartzke, writing for the court of appeals, used a balancing test to determine whether the exigency justified the intrusion. He assumed that this case involved a misdemeanor and concluded that although there was urgency to avoid destruction of evidence, the urgency in this case was not sufficiently great to justify a warrantless arrest in the home. He noted that the "misdemeanor" in this case was not a grave offense. The defendant had not injured any person or property. The defendant's wife and daughter were in no danger. The defendant was in no danger; he was upstairs in bed. An intrusion by the police into a bedroom at night is a serious intrusion on privacy. Entry into the home is ordinarily afforded the most stringent fourth amendment protection. Judge Gartzke's approach of looking at the entire case and balancing the government's need for immediate police action and the defendant's interest in privacy in the home is interesting and worthy of discussion and consideration. It also seems to satisfy the majority's keen interest in balancing and reasonableness. Unfortunately the majority ignores the approach of the court of appeals.

bed) had to be arrested immediately to prevent him from driving another car. The "threat to safety" exception must be limited to situations where the officer has reasonable factual justification to believe the defendant intends to drive again. Without this limitation, in every case involving probable cause to believe that the person was driving under the influence, the police would be justified in making a warrantless entry into the home to arrest the person.

The threatened destruction or removal of evidence presents a more difficult issue of exigent circumstances. It is beyond question that alcohol "disappears" over a period of time and that the evidence of intoxication will be destroyed by the passage of time. But neither the record nor the majority opinion describes the degree of urgency to make the arrest, that is, how long a time period may elapse before the alcohol has disappeared, and the amount of time it would take to obtain a warrant in the city of Madison at 9:30 at night.

Drugs can be flushed down a toilet in seconds. Money or bloody clothes can be burned within minutes. When we talk about "destruction" of the evidence of intoxication we are talking about hours.

Sec. 345.24, Stats. 1977, indicates that it may take up to four hours to allow an intoxicant's blood alcohol content to metabolize to a "safe" level. Sec. 885.235(3), Stats. 1977, states that chemical tests performed within two hours of the event to be proved are given prima facie effect without expert testimony; tests performed more than two hours after the event to be proved are admissible as evidence if expert testimony establishes its probative value and prima facie effect. Thus police can perform the test more than two hours after the event and still have acceptable evidence to present in court. In *State v. Bentley*, 92 Wis.2d 860, 286 N.W.2d 153 (Ct. App. 1979), a blood sample was taken from the accused

three and a half hours after the accident, and the results were apparently damaging to the accused's position. Sec. 885.235(3) was amended in 1982 to provide that samples taken within *three* hours are given prima facie effect without expert testimony; tests not taken within three hours after the event are admissible only if expert testimony establishes their probative value and prima facie effect. See ch. 20, sec. 1816(c) and (e), ch. 184, sec. 5, Laws of 1981.

In this case the police zeroed in on the identity of the defendant in about one half hour after the event to be proved. It is up to the state to introduce evidence that resort to the warrant process was impracticable because the warrant and any test for intoxication would come too late. Yet the state introduced no such evidence. Nor are there scientific facts or facts relating to the practice in Dane County as to the issuance of warrants of which this court might take judicial notice to justify the conclusion that a reasonable officer might reasonably have believed that he had to preserve the evidence from destruction and had no time to get a warrant. Because the state has not met its burden of showing that its warrantless entry was "imperative," I would hold that the circumstances were not exigent.

Accordingly, I would affirm the decision of the court of appeals and remand this case to the circuit court to determine the issue of consent.

To preserve the federal and state constitutional guarantees of the sanctity of the home against the knock on the door in the middle of the night by government officers who do not have a warrant issued by a judicial officer, I dissent.

I am authorized to state that Justice NATHAN S. HEFFERNAN joins this dissent.