STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Thomas G. MARTWICK, Defendant-Appellant.

Supreme Court

*No. 98–0101–CR. Oral argument September 9, 1999.—Decided January 19, 2000.*

2000 WI 5

(Also reported in 604 N.W.2d 552.)

802

For the plaintiff-respondent-petitioner the cause was argued by *Marguerite M. Moeller*, assistant attorney general, with whom on the briefs was *James E. Doyle*, attorney general.

For the defendant-appellant there was a brief by *Robert P. Rusch* and *Rusch & Rusch Law Office, S.C., Medford* and oral argument by *Robert P. Rusch.*

¶ 1. N. PATRICK CROOKS, J. The state, as petitioner, seeks review of an unpublished decision of the court of appeals, *State v. Martwick*, No. 98–0101-CR, unpublished slip op. (Ct. App. July 21, 1998), which reversed a Price County Circuit Court judgment. The circuit court, the Honorable Patrick J. Madden presiding, convicted the respondent, Thomas G. Martwick (hereinafter Martwick), of manufacturing THC, contrary to Wis. Stat. § 961.41(1)(h)1 (1995–96).[1] The court of appeals reversed, holding that the circuit court erroneously denied a suppression motion concerning evidence of marijuana plants seized by sheriff's deputies from the curtilage[2] of Martwick's home. *Martwick*, Slip op. at 1–2.

¶ 2. We reverse. We hold that a curtilage determination is a question of constitutional fact subject to a two-step standard of review: a circuit court's historical findings of fact are reviewed under a clearly erroneous standard, while the ultimate question of constitutional

[1] All subsequent references to the Wisconsin Statutes are to the 1995–96 text unless otherwise noted.

[2] A curtilage is the land and buildings immediately surrounding a house. *See United States v. Dunn*, 480 U.S. 294, 300 (1987). Black's Law Dictionary notes that the word curtilage is

derived from the Latin cohors (a place enclosed around a yard) and the old French cortilliage or courtillage which today has been corrupted into court-yard. Originally, it referred to the land and outbuildings immediately adjacent to a castle that were in turn surrounded by a high stone wall. . . .

Black's Law Dictionary 384 (6th ed. 1990).

fact is reviewed *de novo*. We further hold that applying this two-step process, the five marijuana plants the deputies initially found were outside of the curtilage of Martwick's home. Accordingly, we reverse the court of appeals' decision, which overturned Martwick's conviction.

I.

¶ 3. The record before the circuit court reflects that on June 9, 1997, Brian Roush, a Price County Deputy Sheriff, learned of information conveyed by a confidential informant regarding drug activity occurring at the Martwick residence. On May 3, 1997, the informant apparently saw large amounts of processed and unprocessed marijuana, as well as live plants in Martwick's house. (R. at 35:5–6.) According to the informant, Martwick complained that he needed to keep his plants inside because the weather was too cold in May to transplant them outdoors.

¶ 4. After reviewing the written report with fellow Deputy Sheriff Chris Jarosinski, Deputy Roush inquired about the possibility of obtaining a search warrant of the residence with the assistance of the Price County District Attorney's office. District Attorney Patrick G. Schilling thought the confidential information was probably stale because the informant observed the marijuana at Martwick's residence in May. Because the district attorney was concerned about the information's potential staleness, Deputy Roush decided to investigate further by viewing Martwick's property himself.

¶ 5. Before even reading the confidential informant's report, Deputy Roush had suspected Martwick of growing marijuana. Two years before, a county drug officer told Deputy Roush that he had found remnants

of old marijuana growth in the Town of Elk. Martwick's name appeared on the pails used to grow the marijuana. (R. at 35:37.) Then, during the summer of 1996 another small marijuana plant was found on property thought to belong to Martwick.

¶ 6. Deputy Roush and Deputy Jarosinski drove to Martwick's residence on June 9, and a neighbor gave them permission to park their squad car on the neighbor's property. The boundary lines of Martwick's property are unmarked. The property is one of a group of recreational and year-round homes located along the Wilson Flowage in Price County. Approximately 20 homes fall within a one-mile radius of Martwick's home, and Martwick's nearest neighbor lives directly across the road.

¶ 7. Martwick's 1.52-acre property is irregularly shaped. According to Martwick's hand-drawn diagram, his property is approximately 122 feet long on its eastern edge, 260 feet long on its western edge, 333 feet long on its northern edge, and 413 feet long on its southern edge. (Exhibit 26.) On this diagram, Martwick's house appears near the center of the property, approximately 100 feet from E. Wilson Flowage Road, the main road bounding his property. At the extreme edge of the property farthest from the road are two ginseng sheds. Martwick also raises worms near the ginseng sheds. A gravel driveway leads up to the house from the road.

¶ 8. Martwick does not cultivate a traditional mowed lawn. As defense counsel admitted to the circuit court, his "client's home would not win a Martha Stewart award." (R. at 35:48.) Instead, a twenty-foot clearing surrounds the house in which only low-lying weeds, brush, and wildflowers grow. Woods cover the remainder of the property past the clearing. A footpath

begins within ten feet of the house and extends into the wooded section leading to the ginseng sheds. Martwick occasionally clears the path with a brush cutter.

¶ 9. After parking their squad car, the two deputies walked onto Martwick's property from the neighboring property. According to Martwick's hand-drawn diagram, the deputies entered his property from the southern edge at a point between the house and the ginseng sheds. (Exhibit 26.) In the woods, Deputy Roush tripped over what he thought was some sort of wire placed no more than one foot above the ground. Then, the deputies observed five marijuana plants in four five-gallon plastic pails. Deputy Roush estimated that the pails were located between 50 and 75 feet from the house along the path leading to the ginseng sheds. The plants were approximately two and one-half to three and one-half feet tall. Deputy Roush and Deputy Jarosinski cut a leaf slip off of one of the suspected marijuana plants and returned immediately to the district attorney's office to conduct a Duquenois-Levine test. The leaf slip produced a positive result indicating that it contained THC, the active ingredient in marijuana.

¶ 10. Based on their observations and the test results, that same day the deputies applied for and obtained a search warrant. Within approximately three hours the deputies executed the search warrant and seized the plastic pails with the five marijuana plants, 29 smaller marijuana plants, baggies with green plant material and marijuana seeds, and plant cultivation products, among other items. Deputy Roush also took photographs of Martwick's property. Deputy Roush testified that from the vantage point of the potted plants, he could see the top of Martwick's

house in the distance. (R. at 35:9.)(Exhibit 27.) However, from the house, a person could not see the plants.

¶ 11. The state charged Martwick with manufacturing marijuana contrary to Wis. Stat. § 961.41(1)(h)2. On August 21, 1997, Martwick moved to suppress the evidence the deputy sheriffs obtained on the basis that the search warrant for his residence was not supported by probable cause, since the deputies improperly obtained evidence supporting probable cause to search the entire property by illegally entering the curtilage of his residence. Martwick later moved to suppress on the basis that the search warrant was not issued by a neutral and detached magistrate.[3]

¶ 12. The circuit court denied the defendant's first motion to suppress, stating that the deputies' initial warrantless search on Martwick's premises was valid because they had searched outside the property's curtilage. Therefore, the search warrant they subsequently obtained was properly supported by probable cause. While retaining his right to appeal,[4] Martwick pleaded guilty to and was convicted of manufacturing marijuana in violation of Wis. Stat. § 961.41(1)(h)1.[5] The circuit court withheld his sentence and ordered 18 months of probation.[6]

---

[3] This second motion was filed with the circuit court on September 16, 1997, six days after the motion hearing about the curtilage issue. Martwick seems not to have taken further action regarding the second motion. The record also does not disclose what proceedings, if any, took place pertaining to this motion. Martwick, however, does not raise this issue on appeal.

[4] *See* Wis. Stat. § 971.31(10).

[5] The record indicates that Martwick's charge was amended to a lesser offense. (R. at 25.)

[6] As conditions of probation, Martwick was to pay a fine and costs, spend 90 days in jail with work release privileges, and

¶ 13. Martwick appealed the conviction. The court of appeals first held that "the scope of curtilage for Fourth Amendment purposes is a question of constitutional fact reviewed without deference to the trial court." Slip op. at 3. The court relied on *State v. Kennedy*, 193 Wis. 2d 578, 583, 535 N.W.2d 43 (Ct. App. 1995), for its reasoning, even though *Kennedy* relied on *State v. Lange*, 158 Wis. 2d 609, 617, 463 N.W.2d 390 (Ct. App. 1990), a case that left the issue of standard of review unanswered. Slip. op. at 3. Citing *Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997), the court explained that it is bound by its own prior decisions. Slip op. at 3.

¶ 14. The court then concluded that the leaf slip was seized in an area that was part of the curtilage surrounding Martwick's home. Slip op. at 4. In coming to this conclusion, the court analyzed the four factors that determine the extent of curtilage surrounding a home as set forth in *United States v. Dunn*,[7] 480 U.S. 294, 300 (1987). Slip op. at 4. In regard to the *Dunn* factors, the court felt that the marijuana was in close proximity to the home, and because the marijuana grew in a garden setting, it appeared to be growing in an area " 'use[d] for intimate activities of the home.' " Slip op. at 5–6 (quoting *Lange*, 158 Wis. 2d at 619). Moreover, the overgrown nature of the property indi-

make restitution. Additionally, his driver's license was suspended for six months. (R. at 26.)

[7] The following are the four factors:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. at 301.

cated that Martwick wished to prevent public observation. Slip op. at 6. Finally, the court stated that the "lack of a barrier more formal than heavy flora overgrowth" was insufficient "to diminish Martwick's expectation of privacy." Slip op. at 6.

¶ 15. The court of appeals concluded that the marijuana pails were within the curtilage of Martwick's home. Therefore, the deputies had improperly seized the leaf slip, and it could not serve as the basis for probable cause to obtain a search warrant for the premises. Because the search warrant was invalid, the circuit court erred in failing to suppress all of the evidence seized. Slip op. at 7.

## II.

¶ 16. We first address the issue of standard of review in a curtilage case. We conclude that a curtilage determination presents an issue of constitutional fact. An issue of constitutional fact is a mixed question of law and fact subject to a two-step standard of review. *State v. Phillips*, 218 Wis. 2d 180, 189, 577 N.W.2d 794 (1998). As we recently explained in *Phillips*, 218 Wis. 2d at 190, a circuit court determining an issue of constitutional fact must first make decisions regarding pertinent evidentiary or historical facts. Black's Law Dictionary defines evidentiary facts as "[t]hose facts which are necessary for determination of the ultimate facts; they are the premises upon which conclusions of ultimate facts are based." Black's Law Dictionary 557 (6th ed. 1990).

¶ 17. Resolution of an issue of constitutional fact then requires a circuit court to apply constitutional principles to the evidentiary or historical facts. *State v.*

810

*Fry*, 131 Wis. 2d 153, 171, 388 N.W.2d 565 (1986). A constitutional fact is one whose "determination is 'decisive of constitutional rights.' " William R. Bishin and Christopher D. Stone, *Constitutional Facts, reprinted in* Ruggero J. Aldisert, *The Judicial Process* 703, 704 (1976). Justice Frankfurter elaborated that constitutional facts are "issues which, though cast in the form of determinations of fact, are the very issues to review [for] which this Court sits." *Watts v. Indiana*, 338 U.S. 49, 51 (1949).

¶ 18. On appeal, an appellate court applies a different standard of review to each step in a circuit court's determination of constitutional fact. An appellate court applies a deferential, clearly erroneous standard to a circuit court's findings of evidentiary or historical fact.[8] *Phillips*, 218 Wis. 2d at 190 (quoting *State v. Woods*, 117 Wis. 2d 701, 715, 345 N.W.2d 457 (1984)). An appellate court then determines the questions of constitutional fact independently. *Id.*

¶ 19. We base our conclusion that a curtilage determination is a question of constitutional fact on *Ornelas v. United States*, 517 U.S. 690, 699 (1996), in

---

[8] *Phillips* actually stated that evidentiary or historical findings would not be overturned " 'unless they are contrary to the great weight and clear preponderance of the evidence.' " *State v. Phillips*, 218 Wis. 2d 180, 190, 577 N.W.2d 794 (1998) (quoting *State v. Woods*, 117 Wis. 2d 701, 715, 345 N.W.2d 457 (1984)). We may rely on this articulation of the standard, however, because "cases which apply the 'great weight and clear preponderance' test. . .may be referred to for an explanation of [the clearly erroneous] standard of review [since] the two tests in this state are essentially the same." *Noll v. Dimiceli's Inc.*, 115 Wis. 2d 641, 643, 340 N.W.2d 575 (Ct. App. 1983). *See also State v. Michels*, 141 Wis. 2d 81, 90, 414 N.W.2d 311 (Ct. App. 1987).

which the United States Supreme Court held that on appeal, a judge's ultimate determination of reasonable suspicion and probable cause should be reviewed *de novo*, while findings of historical fact should be reviewed only for clear error. In *Ornelas*, the Court explained that independent appellate review prevents "varied results" even " '[i]n the absence of any significant difference in the facts' " supporting a judge's determinations. *Id.* at 697. Moreover, the Court stated that "the legal rules for probable cause and reasonable suspicion acquire content only through application. Independent review is therefore necessary if appellate courts are to maintain control of, and to clarify the legal principles." *Id.* (citing *Miller v. Fenton*, 474 U.S. 104, 114 (1985)). Finally, the Court explained that "de novo review tends to unify precedent" and provide law enforcement officers with clear rules that guide them in making legally correct decisions before acting to invade someone's privacy. *Id.*

¶ 20. Similarly, this court also grants "independent appellate review of matters of constitutional fact [in order] to provide uniformity in constitutional decision-making." *Phillips*, 218 Wis. 2d at 194. By independently applying constitutional principles, an appellate court is able to add substance and meaning to a skeletal constitutional rule. *Id.* (quoting *State v. McMorris*, 213 Wis. 2d 156, 165, 570 N.W.2d 384 (1997)).

¶ 21. Moreover, this court traditionally applies the two-step standard of review to constitutional search and seizure inquiries.[9] Whether an officer has

[9] *See, e.g., State v. Jackson*, 147 Wis. 2d 824, 829, 434 N.W.2d 386 (1999); *Isiah B. v. State*, 176 Wis. 2d 639, 646, 500 N.W.2d 637 (1993); *State v. Anderson*, 165 Wis. 2d 441, 447, 477

illegally searched within the curtilage of a person's residence is a search and seizure issue under the Fourth Amendment, *Oliver v. United States*, 466 U.S. 170, 180–81 (1984), and art. I, § 11 of the Wisconsin Constitution. In keeping with our preference for independent review of issues of constitutional fact, and our use of the two-step standard of review for other search and seizure inquiries, we hold that the two-step standard of review applies to curtilage determinations.

¶ 22. The state advocates the use of a clearly erroneous standard of review for the ultimate determination of constitutional fact. In support, the state cites to cases from several federal circuits, which have held that as a factual inquiry, a curtilage determination should be reviewed under a clearly erroneous standard.[10] These cases generally reason that although a curtilage determination is a mixed question of law and fact, because it is an " 'essentially factual' inquiry," the clearly erroneous standard of review must apply. *See, e.g., United States v. Traynor*, 990 F.2d 1153, 1156 (9th Cir. 1993)(quoting *United States v. McConney*, 728

---

N.W.2d 277 (1991); *State v. Whitrock*, 161 Wis. 2d 960, 973, 468 N.W.2d 696 (1991).

[10] *See, e.g., United States v. Reilly*, 76 F.3d 1271, 1275, *aff'd on reh'g*, 91 F.3d 331 (2d Cir. 1996); *United States v. Friend*, 50 F.3d 548, 552 (8th Cir. 1995), *vacated on other grounds*, 517 U.S. 1152 (1996); *United States v. Benish*, 5 F.3d 20, 24 (3rd Cir. 1993); *United States v. Knapp*; 1 F.3d 1026, 1029 (10th Cir. 1993); *United States v. Traynor*, 990 F.2d 1153, 1156–57 (9th Cir. 1993); *United States v. Hatch*, 931 F.2d 1478, 1480 (11th Cir. 1991), *cert. denied*, 502 U.S. 883 (1991); *United States ex rel. Saiken v. Bensinger*, 546 F.2d 1292, 1297 (7th Cir. 1976), *cert. denied*, 431 U.S. 930 (1977); *Hodges v. United States*, 243 F.2d 281, 283 (5th Cir. 1957). (Pet. Br. at 10.)

F.2d 1195, 1202 (9th Cir.)(en banc), *cert. denied*, 469 U.S. 824 (1984)).

¶ 23. We find this line of reasoning unpersuasive. A circuit court's curtilage determination is not *essentially* a factual inquiry because it requires review of mixed questions of law and fact.[11] *See Phillips*, 218 Wis. 2d at 189 (stating that "[t]his court has traditionally treated questions of constitutional fact as mixed questions of fact and law, and it has applied a two-step standard when reviewing lower court determinations of constitutional fact.") The initial determination of historical or evidentiary fact is no more important than the ultimate determination of constitutional fact. The federal cases imply that once a circuit court answers the four individual *Dunn* factors, the court's analysis is complete. *See, e.g., Swepston*, 987 F.2d 1510, 1513 (10th Cir. 1993)(stating that the *Dunn* four-factor test "involves purely factual determinations"). However, answering each individual *Dunn* factor does not complete the analysis. The court must still apply the constitutional principles to the facts at hand to answer the question of law. As such, the *Dunn* inquiry cannot be a purely factual inquiry.

■

¶ 24. In sum, a curtilage determination involves an issue of constitutional fact. We therefore apply a two-step standard of review in which we first review a court's evaluation of the individual *Dunn* factors for clear error, whether such findings are contrary to the great weight and clear preponderance of the evidence. Then we review a court's ultimate determination of the extent of curtilage *de novo*.

---

[11] Moreover, the cases the state cites were decided before *Ornelas*, which was decided in 1996.

## III.

¶ 25. Next, we address whether the five marijuana plants the deputies found growing on Martwick's property lay outside the curtilage of his residence. We conclude that the five marijuana plants were located outside the curtilage of the residence, and therefore, the deputies could enter that part of the property and seize a leaf slip from one of the plants during their initial warrantless search.

¶ 26. The Fourth Amendment provides that "people [are] to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . .and [that] no Warrants shall issue, but upon probable cause. . . ." U.S. Const. amend. IV. The protection provided by the Fourth Amendment to a home also extends to the curtilage of a residence. *Oliver*, 466 U.S. at 180. The curtilage is actually "considered part of [the] home itself for Fourth Amendment purposes," *id.* at 180, and is defined at common law as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.' " *Id.* (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

¶ 27. The protections of the Fourth Amendment do not attach to land beyond the curtilage of a home. *See Hester v. United States*, 265 U.S. 57, 59 (1924). Such land includes public areas and what has been described as "open fields." *See id.*

¶ 28. The open fields concept was observed in *Hester*, in which Justice Holmes explained that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." *Hester*, 265 U.S. at 59 (citation omitted).

In *Hester*, police officers seized a jug and bottle of illegal whiskey on Hester's land. *Id.* at 58. The Court held that even though police officers had trespassed on Hester's land, the jug and bottle were not illegally seized because they were seized in the area of the property designated by the Court as the open fields. *Id.* at 58–59.

¶ 29. The distinction observed in *Hester* was reaffirmed in *Oliver*, which stated that "[t]he distinction implies that only the curtilage, not the neighboring fields, warrants the Fourth Amendment protections that attach to the home." *Oliver*, 466 U.S. at 180. Open fields are not confined literally to fields. *Id.* at n.11. Further, "an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers." *Id.* at 181. In fact, "there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields." *Dunn*, 480 U.S. at 304.

¶ 30. In *Dunn*, 480 U.S. at 301, the Supreme Court articulated four factors that a court should refer to when defining the extent of a home's curtilage:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.[12]

[12] The Court also cautioned that

[w]e do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it

We now examine the application of the *Dunn* factors to the facts of this case.

■

¶ 31. We review for clear error the circuit court's findings of fact. At the September 10, 1997, suppression hearing, the circuit court made few findings of evidentiary or historical fact. However, if a circuit court fails to make a finding that exists in the record, an appellate court can assume that the circuit court determined the fact in a manner that supports the circuit court's ultimate decision. *See Sohns v. Jensen*, 11 Wis. 2d 449, 453, 105 N.W.2d 818 (1960). Moreover, the court stated that the area where the deputies found the five marijuana plants was not posted or fenced, and that Martwick had a reduced expectation of privacy in that part of his property.[13] (R. at 35:38.) Finally, the court concluded:

> I look at all the information provided, all the testimony provided, all the evidence provided, and I find that the interests of law enforcement in curbing illegal activity is sufficiently a concern of this Court, that the Court reiterates that this officer proceeded

should be placed under the home's 'umbrella' of Fourth Amendment protection. *Dunn*, 480 U.S. at 301.

[13] Martwick also argues that the deputies violated his reasonable expectation of privacy in the area 50–75 feet from his home. (Resp. Br. at 14–16.) However, "[t]he [open fields doctrine] is consistent with respect for 'reasonable expectations of privacy.' " *Oliver*, 466 U.S. 170, 180 (1984). In fashioning the *Dunn* factors, the United States Supreme Court clearly took into consideration an individual's right to privacy. *See Dunn*, 480 U.S. at 300. As such, the privacy issue is interwoven with the curtilage determination and need not be considered separately.

with—proceeded cautiously with information which he believed to be reliable. He had private, previous information of his own. He proceeded to verify that information.

I am of the opinion, and let the Appeals Court proceed as they see fit, but there are no open fields in this particular area. This is a wooded area. This is the northwoods, and that's what it looks like, and this is outside the curtilage.

I am clearly of the opinion, and based on the case law as cited by Mr. Schilling I'm further of the opinion this is outside the curtilage. There is no expectation of privacy in that particular area, and that the warrant then was appropriately sought, appropriately drafted, appropriately executed, and the Court then and therefore denies the motion.

(R. at 35:52.) There has been nothing presented which would lead us to conclude that any of Judge Madden's findings are clearly erroneous.

¶ 32. Our own analysis of the *Dunn* factors leads us to conclude that the five marijuana plants were indeed outside the curtilage of Martwick's home. Therefore, the deputies could legitimately seize a leaf slip from one of the plants, which, when tested, provided probable cause for the subsequent issuance of a search warrant covering the entire Martwick property.

¶ 33. First, the record indicates that the pails were located between 50 and 75 feet from the house. If the proximity factor would be the sole factor examined in the *Dunn* analysis, this would be a close case. However, no bright-line rule exists for ascertaining when a distance is in close proximity, and cases are often inconsistent in this regard. *See United States v. Soliz*, 129 F.3d 499, 502 (9th Cir. 1997)(comparing a variety of federal cases in which similar distances were held to be either within or outside the curtilage).

¶ 34. Further, it is helpful to examine the distance in relation to the total size of the property. *See United States v. Reilly*, 76 F.3d 1271, 1277 (2d Cir. 1996). On a smaller property, such as Martwick's property, the curtilage may very well extend for less distance than on a larger property, where the owner has more room to conduct his or her "intimate activit[ies] of. . .life." *Oliver*, 466 U.S. at 180. Simply because a property is small, and the relative distances involved are less than that of a large property, it does not mean that virtually the whole property must be within the curtilage. Therefore, while the distance between Martwick's home and the marijuana plants was not vast, our inquiry does not end with this factor.

¶ 35. We also distinguish our recent curtilage analysis in *State v. O'Brien*, 223 Wis. 2d 303, 316, 588 N.W.2d 8 (1999), in which we found that a truck parked approximately 200 feet from a farmhouse was within the curtilage. Although that distance is obviously greater than the distance in this case, other factors strongly indicated that the truck was still within the curtilage. Most significantly, the truck was parked next to the outbuilding of the farm complex. *O'Brien*, 223 Wis. 2d at 303. The farm complex consisted of a "duplex, a barn, an outbuilding, a small backyard and two driveways." *Id.* at 310. This court stated that in the context of a "rural setting," *id.* at 316, the area extending to the outbuilding was in the curtilage. *Id.* at 316. *See also Dunn*, 480 U.S. at 307–09 (Brennan, J., joined by Marshall, J., dissenting)(pointing out that in the context of a farm, many state and federal courts hold that the curtilage of the farmhouse often extends to barns and outbuildings).

¶ 36. In contrast, Martwick's property is not a farm. As such, our analysis in *O'Brien*[14] is not analogous to this case. Moreover, because Martwick's property is not a farm, the curtilage does not automatically extend to his ginseng sheds.

¶ 37. Second, Martwick did not erect any fence or other enclosure surrounding his home. Deputy Roush tripped over some wire on the property, but that wire apparently did not surround the home.

¶ 38. It is significant that the marijuana plants did not stand in the area of low-cut weeds and brush surrounding the house. *Oliver* noted that the curtilage of most homes is clearly marked. *Oliver*, 466 U.S. at 182, n.12. Similarly, in *United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997), the Sixth Circuit found that the curtilage of the home only extended to the portion of the property that was maintained as a backyard in contrast to the rest of the property, which was a wooded field.[15]

¶ 39. In this case, the curtilage is clearly marked by the low-cut weeds and brush. The photographs introduced into evidence of Martwick's property indi-

---

[14] In *O'Brien* there were other significant differences as well. Officers entered onto the property with a search warrant that permitted them to search the premises. Because the search warrant extended to the premises, the issue was whether the physical proximity test applied to the search warrant. *State v. O'Brien*, 223 Wis. 2d 303, 314, 588 N.W.2d 8 (1999).

[15] The Sixth Circuit described the contrast by stating that "[d]efendants' backyard is clearly demarked as a continuation of the home itself. No one could mistake the yard, and its neatly mowed lawn and garden arrangements, for the unkempt open fields composing the remaining portion of defendants' rural property." *United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997).

cate that the low-cut weeds extend approximately twenty feet from the house. The tree line then suddenly appears at twenty feet, and the trees further continue to the property's border and beyond. Moreover, from the photographs, there is no way to differentiate between the edge of Marwick's property and the property of his abutting neighbors. (Exhibits 1–25, 27–28.)

¶ 40. Martwick argues that trees and shrubs that surround a house can fulfill the enclosure requirement. (Resp. Br. at 11.) For this proposition Martwick cites *Lange*, 158 Wis. 2d at 618. We disagree. The facts in *Lange* actually support our conclusion. The court of appeals explained that "the house and garden stood alone in the middle of *farm fields*, surrounded except for the driveway entrance on all four sides by trees. . . ." *Lange*, 158 Wis. 2d at 618–19 (emphasis added). In this case, the point where the woods begin also marks the boundary of the curtilage. However, the wooded area is not within the curtilage because the trees begin at a point twenty feet from the house, and therefore, mark the end of the twenty-foot clearing surrounding the house.

¶ 41. Third, Martwick did not use the area where the marijuana plants were found for anything in particular. While the marijuana was found near the rough footpath on the property, we do not consider that fact significant. Martwick also argues that the footpath leads to a "garden." (Resp. Br. at 12–13.) We agree with the state that the sheds where Martwick cultivated ginseng and worms do not constitute a garden, "as that term is commonly understood." (Pet. Reply Br. at 10.) Moreover, no witness characterized the ginseng sheds as a garden at the suppression hearing. Nothing indicates that the area was used for "intimate activity associated with the 'sanctity of a man's home and the

privacies of life.' " *Oliver*, 466 U.S. at 180 (quoting *Boyd*, 116 U.S. at 630).

¶ 42. Fourth, the photographs introduced into evidence indicate that the trees at the edge of Marwick's property were fairly dense. By placing the marijuana among the dense trees, Martwick was able to protect the marijuana from observation from the street. However, as we noted above, Martwick seems to live in a naturally wooded area. He did not plant or cultivate the trees that grow on his property. Martwick therefore did not create this protected area, as opposed to an individual who plants a tree line around his or her property, or builds a high wall or fence. Martwick simply has not exercised dominion over his woods, so as to make the woods an intimate part of his home. If the entire lot were curtilage, then this court would be creating an observation-free zone for criminal activity on all wooded property, greatly undercutting legitimate law enforcement efforts. Therefore, this final factor supports the other evidence that the marijuana was found outside of the curtilage of the home.

## IV.

¶ 43. In conclusion, we hold that a curtilage determination is a question of constitutional fact subject to a two-step review. The findings of evidentiary or historical fact are reviewed for clear error, to determine whether such findings are contrary to the great weight and clear preponderance of the evidence. The ultimate determination of constitutional fact is reviewed *de novo*. We further hold that applying this two-step process, the five marijuana plants the deputies initially found were outside of the curtilage of Martwick's home. Because they were outside the curtilage, the deputies

could seize a leaf sample. The leaf sample, when tested, provided probable cause for the search warrant, and therefore, the deputies' subsequent search and seizure of the evidence of marijuana cultivation was proper. Accordingly, we reverse the court of appeals' decision, which overturned Martwick's conviction.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 44. DAVID T. PROSSER, J. *(concurring).* This important case interprets the scope of protection from a warrantless search under the Fourth Amendment. I join the mandate and opinion of the court but write separately to respond to the dissent and to emphasize certain elements underlying the decision.

¶ 45. Price County sheriff's deputies had reason to believe that Thomas Martwick was growing marijuana at his home. An informant reported seeing marijuana plants inside his house, but more than a month passed after this sighting before the evidence was presented to the district attorney. The district attorney understood both the sanctity of the home and the integrity of the warrant process. He was concerned that the evidence to support a search warrant was stale, and after consulting with the judge, he deferred taking action.

¶ 46. Thereafter, two deputies went to the Martwick property to see if they could secure fresh evidence to support the issuance of a warrant. They entered Martwick's wooded land from the south and soon encountered five marijuana plants in plastic pails situated along a primitive path at least 50 feet from the house.

823

¶ 47. The question before the court is whether Martwick placed the five marijuana plants within a zone around his house—the curtilage—in which he could legitimately expect privacy. The majority concludes that the curtilage ended where the woods began[1] —about 20 feet from the house and at least 30 feet away from the marijuana plants. The dissent implies that the entire 1.52 acres of property, except the area of the driveway leading from the street and the area in plain view from that driveway, was curtilage.

¶ 48. All that this court must decide is whether the curtilage of the Martwick property extended more than 50 feet from the house, because the deputies never came closer than within 50 feet of the house.

¶ 49. The Fourth Amendment to the United States Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

¶ 50. Curtilage is treated as an extension of a person's house. "At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' *Boyd v. United States*, 116 U.S. 616, 630 (1886), and therefore has been considered part of the home

---

[1] In *State v. Lange*, 158 Wis. 2d 609, 618, 463 N.W.2d 390 ( Ct. App. 1990), the court of appeals affirmed a circuit court finding that the "tree line surrounding Lange's garden marked his curtilage."

itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180 (1984). Courts define curtilage "by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private" (citations omitted). *Id.*

¶ 51. These factors were explicitly spelled out in *United States v. Dunn*, 480 U.S. 294, 301 (1987):

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

¶ 52. It is beyond dispute that "proximity" is not the only factor in determining curtilage. "The distance from a house to the area in question, while a useful factor in the analysis, is by no means dispositive since the three other factors must also be considered." *State v. Hall*, 719 A.2d 435, 437 (Vt. 1998). A home's curtilage often depends upon the lay of the land and what the homeowner has done with the property.

¶ 53. The dissent complains that the majority "ends the curtilage—and ends constitutional protection for the home—at 20 feet from the house, far less than 10 yards, the distance of a 'first down.' " Dissent at ¶ 5. That determination, of course, applies to the facts *in this case.* The reason the curtilage in this case stops short of a "first down" is that the tree line was the limit of Martwick's "forward progress." He could have pushed the curtilage the length of an entire football field if he had made the effort—if he had moved the frontier of his ungroomed, unmanaged, uncontrolled

woods farther from his house, or taken other action to improve or assert control over his land.

¶ 54. Martwick never took control of his property in a way that would give him an expansive curtilage. A property owner cannot reasonably argue that wooded land is "part of the home itself" if the property owner does not fence the land, clear the land, or use the land for some purpose consistent with the "privacies of life."

¶ 55. In *Oliver*, the Supreme Court strongly affirmed the vitality of the "open fields" doctrine first announced in *Hester v. United States*, 265 U.S. 57 (1924). "Open fields" are the antithesis of curtilage even though they may be privately owned, because they are open areas not intimately linked to the home, either physically or psychologically. *See California v. Ciraolo*, 476 U.S. 207, 213 (1986).

¶ 56. The *Oliver* decision included a consolidated case, *Maine v. Thornton*, No. 82–1273, highly relevant to the case at hand. The Court stated the facts as follows:

> After receiving an anonymous tip that marihuana was being grown in the woods behind respondent Thornton's residence, two police officers entered the woods by a path between this residence and a neighboring house. They followed a footpath through the woods until they reached two marihuana patches fenced with chicken wire. Later, the officers determined that the patches were on the property of respondent, obtained a warrant to search the property, and seized the marihuana.

*Oliver*, 466 U.S. at 174. The trial court held that "No Trespassing" signs on the property and the secluded location of the "marihuana" patches evinced a reasonable expectation of privacy. Therefore, it said that the

826

"open fields" doctrine did not apply, and the Maine Supreme Judicial Court affirmed. *Id.* at 175. The United States Supreme Court reversed, saying:

> . . . [O]pen fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. . . .[T]he asserted expectation of privacy in open fields is not an expectation that "society recognizes as reasonable."

*Id.* at 179. The Court declared that "[a]n open field need be neither 'open' nor a 'field' as those terms are used in common speech. . . .[A] *thickly wooded area. . .*may be an open field as that term is used in construing the Fourth Amendment." *Oliver*, 466 U.S. at 180, n.11 (emphasis added).

¶ 57. The Supreme Court of Vermont reached the same conclusion in *Hall*, 719 A.2d at 437:

> The Fourth Amendment has been interpreted to permit warrantless entry onto "open fields," or areas outside of the curtilage where there is no reasonable expectation of privacy. . . .Since no signs were posted, nor were other methods used, to indicate that defendant sought to exclude the public from the woods adjacent to his yard, we conclude that defendant had no expectation of privacy from a walk-on search in the wooded area behind his house.

*See also Bedell v. State*, 521 S.W.2d 200, 201 (Ark. 1975); *State v. Webb*, 943 P.2d 52 (Idaho 1997).

¶ 58. The dissent voices concern for a property owner's privacy, but it fails to articulate a test that

distinguishes one part of Martwick's extensive woods from another. It implies that the entire wooded area of this 66,000 square-foot property (not including the area directly visible from the driveway) is protected from warrantless police investigation, even though there was nothing to mark the boundaries of the property from the property of neighbors, no signs excluding trespassers, no serious fencing, and no evidence of use of the woods except for a rough path between the ginseng sheds at the back of the lot and the house.

¶ 59. The placement of several five-gallon pails containing marijuana plants along the path was no doubt intended to conceal criminal activity and escape attention. Martwick's expectation of privacy was not, however, *"legitimate* in the sense required by the Fourth Amendment." *Oliver*, 466 U.S. at 182.[2] Society is not willing to recognize all "expectations" of privacy as reasonable.[3] People who own wooded property can-

---

[2] The officers took photographs of the Martwick house from the spot where they discovered the pails. The officers could see only the top of the house. If the officers were able to see no more than the top of the house, their "prying eyes" did not invade Martwick's privacy.

[3] The United States Supreme Court observed that Fourth Amendment analysis hinges on two questions: "first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). For the first inquiry, Martwick no doubt manifested a subjective expectation that his illegal plants would remain concealed in privacy. For the second inquiry, whether Martwick's expectation of privacy was "reasonable," we must consider " 'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.' " *Id.* at 212 (citing *Oliver v. United States*, 466

not expect to grow illegal crops in their woods, free from surveillance, without doing considerably more to secure their privacy than leave their property in a natural state.

¶ 60. Martwick did not place any enclosure around his woods or take steps to discourage public entry onto his property. He did not use the woods for the kind of lawful activities intimately associated with the home. Therefore, the circuit court was correct in denying Martwick's motion to suppress evidence.

¶ 61. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting)*. This decision allows law enforcement officers who have no search warrant to enter the residential subdivision lot and search 20 feet from the house where the defendant resides.

¶ 62. The property in question is a one and one-half acre lot in a platted residential subdivision next to a public lake lined with cottages. The lot is near roads and adjacent to neighbors' houses in the same subdivision. Except for the house, driveway and sheds at the rear of the property, the lot has been left in a natural state. A drawing of the lot based on the defendant's sketch is attached.

¶ 63. I would affirm the decision of the court of appeals. I dissent because I conclude that allowing a warrantless search 20 feet from the house violates the Fourth Amendment of the U.S. Constitution.[1] The

U.S. 170, 181–83 (1984)). Here, there was no infringing intrusion upon protected values because Martwick failed to extend the sanctity and privacy of his home to his land.

[1] U.S. CONST. amend. IV provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

State has failed to meet its burden of proving that the area in which the marijuana was found was outside the home protected by the Fourth Amendment from warrantless searches. The uncontroverted evidence is that . the defendant's use of the area in question is a use ordinarily considered as part of the curtilage to the home.

¶ 64. The fundamental constitutional principle governing this case is that a warrantless search of a home is "presumptively unreasonable." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).[2]

¶ 65. The home protected by the Fourth Amendment includes more than the house. The constitutional protections attach to land surrounding the house. The land around the house protected by the Fourth Amendment is known in the law as the curtilage of the home.[3] The majority opinion in this case ends the curti-

---

shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[2] Before entering the defendant's property the officers attempted to get a search warrant but were rebuffed by the district attorney and the judge, who determined that the officers did not have probable cause to believe that evidence of a crime would be found on the defendant's property. There is no evidence to suggest that an emergency existed or that the officers otherwise had legal grounds to search the defendant's property.

The majority's decision may have an unforeseen consequence. In narrowing the meaning given to curtilage the court also may be narrowing the scope of searches permissible under a warrant authorizing a search of a building.

[3] Areas within the curtilage may be subject to police observation. The U.S. Supreme Court has allowed police observation

lage—and ends constitutional protection for the home—at 20 feet from the house, far less than 10 yards, the distance required for a "first down."

¶ 66. The U.S. Supreme Court has held that the protected curtilage extends to the land that "an individual reasonably may expect. . .should be treated as the home itself."[4] The curtilage is an area so intimately tied to the home that it should be placed under the home's protective umbrella.[5]

---

of a curtilage from a plane in public navigable airspace. *California v. Ciraolo*, 476 U.S. 207 (1986).

[4] *United States v. Dunn*, 480 U.S. 294, 300 (1987).

[5] *Dunn*, 480 U.S. at 301.

The relation between the curtilage and open fields doctrines is unclear. The open fields cases appear to deal with the issue of whether a person may have a reasonable expectation of privacy and protection of the Fourth Amendment in property that is not within the home's curtilage. *See Oliver v. United States*, 466 U.S. 170, 180 n. 11 (1984) ("Neither petitioner Oliver nor respondent Thornton has contended that the property searched is within the curtilage. . . .It is clear, however, that the term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage."); 1 Wayne R. LaFave, *Search and Seizure* at § 2.3(d) (3d ed. 1996) ("in applying *Oliver* in *United States v. Dunn* [480 U.S. 294 (1987)], the Court ruled that merely looking into a barn outside the curtilage was no search, but did not challenge the defendant's assertion 'that he possessed an expectation of privacy independent from his home's curtilage. . . .' "); at § 2.4(a) ("Because *Oliver* takes the position that to fall within the 'open fields' classification the area in question must be outside the curtilage, the meaning of that concept has become increasingly important. . .").

Also murky is the relation of the reasonable expectation of privacy doctrine to the open fields doctrine. *See, e.g., United States v. Santa Maria*, 15 F.3d 879 (9th Cir. 1994) (holding that although defendant's trailer was outside the curtilage to the

¶ 67. The State has the burden of proving that a warrantless search does not violate the U.S. Constitution.[6] In other words, the State must prove that the area searched in this case is not curtilage. The State has not met this burden. Accordingly, I agree with the court of appeals that this search violated the U.S. Constitution.[7]

¶ 68. The State argues that the use to which the property is put is the determinative factor in determining curtilage in this case. Petitioner's Brief at 14, 17. Several courts have held that a homeowner's maintenance of a garden in an area being searched is strong evidence that the area is part of the protected curtilage.[8]

¶ 69. The defendant testified that the marijuana pots were on a path that he "routinely" traveled between his house and the sheds at the rear of the lot, which contained his ginseng and goldenseal plants. He also raised worms in horse manure in this area and

---

home, it was still protected from warrantless searches by the Fourth Amendment).

[6] *State v. Washington*, 134 Wis. 2d 108, 120, 396 N.W.2d 156 (1986).

[7] I also agree with the court of appeals (and the majority opinion) that the scope of curtilage for Fourth Amendment purposes is a question of constitutional law that an appellate court decides independently, benefiting from the legal analyses of other courts that have addressed the issue.

[8] *See, e.g., State v. Lange*, 158 Wis. 2d 609, 618–20, 463 N.W.2d 390 (Ct. App. 1990) (marijuana seized was within the defendant's curtilage since it was next to a vegetable garden and enclosed by a fence on three sides); *United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997) (holding that part of a search was unlawful because it invaded defendants' enclosed backyard, which had a garden, a laundry line, and other homelike activities).

kept a compost heap, which he used to fertilize the ginseng. He further testified that he kept the path open with a brush cutter.

¶ 70. The investigating officer agreed there was a path or trail leading from the house toward the back of the lot. According to the officer, he did not follow the path beyond the marijuana pails and therefore offered no evidence about the use of the sheds. The State thus presented no evidence to contravene the defendant's testimony.

¶ 71. The majority opinion finds that the sheds where the defendant cultivated ginseng and worms do not constitute a garden " 'as that term is commonly understood.' " Majority op. at ¶ 41 (quoting Petitioner's Reply Brief at 10). It is unclear what evidence the majority opinion relies on to make this factual finding.

¶ 72. The circuit court made no finding of fact about the defendant's use of the area in question. Furthermore, the circuit court made no mention of how the evidence fits within the test established by the U.S. Supreme Court in *United States v. Dunn*, 480 U.S. 294 (1987). The circuit court simply concluded that "there was no expectation of privacy in that particular area and that the warrant was appropriately sought." The circuit court's findings and decision are quoted in full at ¶ 31 of the majority opinion.

¶ 73. The majority acknowledges that the circuit court made "few findings of evidentiary or historical fact" but asserts that "an appellate court can assume that the circuit court determined the fact in a manner that supports the circuit court's ultimate decision." Majority op. at ¶ 31 (citing *Sohns v. Jensen*, 11 Wis. 2d 449, 453, 105 N.W.2d 818 (1960)). This rule of appellate practice does not apply in the present case.

¶ 74. An appellate court can assume that the circuit court made a finding of fact only when evidence exists in the record to support the "assumed fact." If the record does not support the "assumed fact" then the finding of the "assumed fact" is clearly erroneous and cannot be sustained. Nothing in the record supports a factual finding by the circuit court that the area in question was not used for gardening. Thus the circuit court could not make this particular finding of fact, which the majority assumes it made. An appellate court as a rule cannot make any findings of fact.[9] I conclude therefore that the State has not met its burden to prove that the area searched was not curtilage.

¶ 75. In addition to relying on a record that is factually insufficient, the majority opinion fails to provide any compelling overall rationale or theoretical basis for its conclusion that the curtilage ends 20 feet from the house. The majority opinion concedes that the four factors set forth in *United States v. Dunn*, 480 U.S. 294 (1987), a case which involved a search on a 198-acre ranch, are not to be applied mechanically.[10] The majority nevertheless undertakes a formalistic review of each of the *Dunn* factors but engages in no analysis of the *Dunn* factors as a whole, how they interact, or how they weigh against each other.

¶ 76. The majority opinion delivers two messages that are of dubious validity. First, the majority opinion seems to say that law enforcement has a right to observe at least some part of everyone's wooded residential lot without a search warrant, or it "would be creating an observation-free zone for criminal activity

[9] *Wurtz v. Fleischman*, 97 Wis. 2d 100, 108, 293 N.W.2d 155 (1980).

[10] *See* majority op. at ¶ 30 n.12 (quoting *United States v. Dunn*, 480 U.S. at 301).

on all wooded property." Majority op. at ¶ 42. I disagree with the suggestion that law enforcement must be given an area in every residential wooded lot from which to observe the property without a warrant.

¶ 77. Second, the majority suggests that if home-owners want Fourth Amendment protection for land around their house then they must chop down any existing trees and plant new ones. The majority opin-ion suggests that if the defendant had planted the trees, the tree line would support an expectation of privacy on his lot, but because the defendant merely left trees standing he did not express an expectation of privacy. Majority op. at ¶ 42. I cannot agree with this reasoning. *See State v. Lange*, 158 Wis. 2d 609, 620, 463 N.W.2d 390 (Ct. App. 1990) (whether defendant planted trees or "merely chose to live on the property because the trees afforded privacy, he took steps to protect the area from observation by people passing by").

¶ 78. I agree with the court of appeals that the facts in this record are insufficient to support a conclu-sion that the warrantless search was constitutional. If the majority is unwilling to suppress the evidence of the marijuana plants, it should remand this case to the circuit court to give the State a second chance to prove that the land in question is outside the curtilage. Before this court impinges on the privacy of a home, the court should demand a better record than exists in the present case.[11]

---

[11] This case is one of several in which I believe the court has not been sufficiently protective of the privacy of the home. For example, in *State v. Welsh*, 108 Wis. 2d 319, 321 N.W.2d 245 (1982), this court allowed law enforcement officers to enter a home to arrest a driver suspected of driving under the influence of intoxicants, which was a non-criminal offense at that time

¶ 79. For the reasons set forth, I dissent.

¶ 80. I am authorized to state that JUSTICE WILLIAM A. BABLITCH and JUSTICE ANN WALSH BRADLEY join this dissent.

under Wisconsin law. The U.S. Supreme Court overturned this decision. *Welsh v. Wisconsin*, 466 U.S. 740 (1984).

In *State v. Stevens*, 181 Wis. 2d 410, 511 N.W.2d 591 (1994) and *State v. Richards*, 201 Wis. 2d 845, 549 N.W.2d 218 (1996), this court declared that a no-knock entry is permissible when officers have a warrant to search the home of a suspected felony drug dealer. The U.S. Supreme Court concluded that our court had erred in adopting this categorical approach. *Richards v. Wisconsin*, 520 U.S. 385 (1997).

Similarly the majority does not give sufficient consideration to the Fourth Amendment's protection of the home in this case and in *State v. Ward*, 2000 WI 3, 231 Wis. 2d 723, 604 N.W.2d 517.

**Drawing of the Lot Based on the Defendant's Sketch**

N 8016 E. Wilson Flowage Rd.

