**COURT OF APPEALS
DECISION
DATED AND FILED**

**December 17, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.  2020AP1171-FT**

**STATE OF WISCONSIN**

Cir. Ct. No.  2019ME211

**IN COURT OF APPEALS
DISTRICT III**

IN THE MATTER OF THE MENTAL COMMITMENT OF R. W.:

OUTAGAMIE COUNTY,

    PETITIONER-RESPONDENT,

  V.

R. W.,

    RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Outagamie County: GREGORY B. GILL, JR., Judge. *Affirmed*.

¶1     HRUZ, J.[1] Rachel[2] appeals orders extending her involuntary commitment and her involuntary medication and treatment. She argues

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2017-18). This is an expedited appeal under WIS. STAT. RULE 809.17 (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Outagamie County (the County) failed to prove by clear and convincing evidence that she is dangerous as that term is used in WIS. STAT. § 51.20(1). We affirm.

## BACKGROUND

¶2 Rachel was committed to the custody and care of the County pursuant to an order that was set to expire, and on December 18, 2019, the County petitioned the circuit court to extend Rachel's commitment and involuntary medication orders for one year. On January 9, 2020, the court held a hearing on the petition.

¶3 The County's first witness was Russell Marmor, an employee at the County's health and human services department. Marmor oversaw the County's community support program and additionally oversaw Rachel's day-to-day functioning. Marmor testified that he had been working with Rachel on and off since 2008 and that her current commitment began in July 2019.[3] Marmor also testified that although he was not working directly with Rachel—and was not directly responsible for her care—prior to her July 2019 commitment, he had contact with Rachel because, due to his rapport with her, he would receive calls from the police requesting his assistance with issues involving her.

¶4 Marmor stated that Rachel's diagnosis was schizoaffective disorder, and he testified that she was committed in July 2019 because she had stopped

---

[2] Following the parties' lead, and pursuant to the policy underlying WIS. STAT. RULE 809.86, we refer to R.W. using the pseudonym "Rachel."

[3] Marmor testified mistakenly that Rachel's commitment began in June 2019. Our review of the record revealed that her commitment began in July 2019. We therefore refer to that date throughout our opinion.

taking her medications and had made threats to her family, making her "potentially dangerous at that time." Marmor admitted, however, that he did not have firsthand knowledge of Rachel's failure to take her medications; instead, he relied on reports from her family members in that regard.

¶5    Marmor further testified that Rachel is prescribed Haldol and Artane to alleviate the symptoms of her schizoaffective disorder, with both medications capable of being taken orally or by injection. He explained that the medications were additionally prescribed as injectables because Rachel's "oral medication compliance ha[d] been questioned." As an example, Marmor testified that in October 2019, he "personally observed 20 oral Haldol in a side dish on her counter leading [him] to believe she ha[d] not been compliant with her oral medication." Marmor additionally opined that Rachel would not take her medications on a voluntary basis, stating:

> Well, I think the past is the best indicator of future behavior. We have four commitments, four attempts to allow for more independence and more autonomy, and all four times have led to decompensations and the need for another commitment. And I would just also add that this is concerning for two major reasons. One is that her life gets completely torn apart at this time and she has to put it back together.
>
>  ….
>
> When I say "at this time," I mean when she decompensates[,] it has a very detrimental effect on her family and her livelihood. And the second note is that when she decompensated—when she decompensates, it's—she—people do not always return to baseline so it's concerning and problematic.

¶6    Marmor further testified that when Rachel is "not on a therapeutic dose of her medication, it has the effect of her becoming impulsive, irritable,

dangerous, and in the state that [he has] seen her at several points in time throughout the past." He stated that after each of Rachel's four prior commitments she had decompensated to the point where she became the subject of another commitment.

¶7 The County next called Dr. Marshall Bales to testify. Bales had known Rachel for approximately five years, and he had been her treating physician for the past six months, during Rachel's current commitment. Bales testified that Rachel was diagnosed with schizophrenia, that she was a proper subject for treatment, that she responds well to the medications when she takes them, and that Rachel would be a proper subject for commitment were treatment to be withdrawn. Bales further testified:

> She takes her medication compliantly as far as I know, but what she does, frankly, is over time she stops her medication and then some kind of dangerous psychotic incident will occur. … I'm just worried that she will stop her medication. She will not stop it like in a day or a week, but she will stop it in my opinion within a period of time, and then what happens, and the history with her verifies this, is she goes off her medication and then she has to be rehospitalized and recommitted again.

When asked whether he was aware of any incidents where Rachel had stopped taking her medications during her current commitment, Bales responded, "She is taking her medication and is really doing well, and I do not know of any episodes of noncompliance offhand."

¶8 Doctor Bales testified that Rachel seemed to have a "surface" understanding of her mental illness, "but then down the road she goes off her medication" nevertheless. He also testified that he had explained to Rachel the advantages, disadvantages and alternatives to medication "[r]epeatedly over time,"

4

and that she was incapable of making an informed choice about taking her medications. Bales explained further:

> She can … express everything I tell her, she can express it back, but the bottom line is that she does not walk the walk. She will say the words, I will stay on my medication, but her history is she goes off of the medication and she doesn't walk the walk of her words and staying on the medication.

¶9 Rachel testified in opposition to her recommitment. She stated that she would voluntarily continue her treatment and taking her medications if she were not recommitted to the County. Rachel explained the reason she intended to do so was

> [b]ecause [the medications] have psychotropic benefits for me that the psychotic part of your brain that gives you psychotic thoughts, the Haldol suppresses them thoughts and then you don't have them, your mind don't race and stuff like that. I haven't had any symptoms. The Haldol keeps my—my schizophrenia in remission. I haven't been hospitalized other than an arrest because of—they thought I wasn't taking my meds. I haven't been hospitalized for a year-and-a-half that I wasn't on commitment with Dr. Bales. I had an outside psychiatrist.

¶10 The circuit court extended Rachel's commitment order for one year. The court determined that Rachel had a mental illness, schizoaffective disorder or schizophrenia, and that her mental illness was treatable. The court also concluded that "without continued treatment [Rachel] would again become a suitable subject for treatment," explaining that it was "not satisfied that there is enough proof of compliance" with Rachel personally taking her medications. The court further explained its decision in that regard as follows: "Dr. Bales had espoused, and Mr. Marmor had also espoused, and to use, I believe it was Dr. Bales, sort of description, [Rachel] does a good job of talking the talk but walking the walk is a

little bit different. And I have some concerns with that." Consequently, the court also extended the involuntary medication order. Rachel now appeals.

## DISCUSSION

¶11 In order to extend Rachel's commitment under WIS. STAT. ch. 51, the County had the burden to show by clear and convincing evidence that she: (1) is mentally ill; (2) is a proper subject for treatment; and (3) meets one of the five statutory standards of dangerousness set forth in WIS. STAT. § 51.20(1)(a)2. *See **Langlade Cnty. v. D.J.W.***, 2020 WI 41, ¶¶23, 29, 391 Wis. 2d 231, 942 N.W.2d 277. Rachel challenges only the third element on appeal—i.e., that the County failed to prove by clear and convincing evidence that she was dangerous.[4]

¶12 Because the County is petitioning for Rachel's recommitment, there is an additional manner in which it can prove Rachel's dangerousness. *See **id.***, ¶32.

> [T]he requirements of a recent overt act, attempt or threat to act under [WIS. STAT. § 51.20(1)](a)2.a. or b., pattern of recent acts or omissions under par. (a)2.c. or e., or recent behavior under par. (a)2.d. may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.

---

[4] Although Rachel appeals from orders for both involuntary commitment and for involuntary medication and treatment, she does not present any argument relating to the latter order. Therefore, we affirm without addressing the medication and treatment order and turn to the order for involuntary commitment. *See **State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (stating that we "may decline to review issues inadequately briefed").

WIS. STAT. § 51.20(1)(am). Section 51.20(1)(am) "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur." *D.J.W.*, 391 Wis. 2d 231, ¶33 (citation omitted). The statute also serves

> to avoid the "revolving door" phenomena whereby there must be proof of a recent overt act to extend the commitment but because the patient was still under treatment, no overt acts occurred and the patient was released from treatment only to commit a dangerous act and be recommitted. The result was a vicious circle of treatment, release, overt act, [and] recommitment.

*State v. W.R.B.*, 140 Wis. 2d 347, 351, 411 N.W.2d 142 (Ct. App. 1987).

¶13　Despite the foregoing allowances, dangerousness remains an element that must be proven to support recommitment. *D.J.W.*, 391 Wis. 2d 231, ¶33. "The alternate avenue of *showing* dangerousness under [WIS. STAT. § 51.20(1)](am) does not change the elements or quantum of proof required. It merely acknowledges that an individual may still be dangerous despite the absence of recent acts, omissions, or behaviors exhibiting dangerousness outlined in [WIS. STAT.] § 51.20(1)(a)2.a.-e." *Portage Cnty. v. J.W.K.*, 2019 WI 54, ¶24, 386 Wis. 2d 672, 927 N.W.2d 509. In other words, the County must still prove that Rachel *is* dangerous, but it need not show Rachel evidenced the recent acts, omissions, or behaviors exhibiting dangerousness outlined in § 51.20(1)(a)2.a.-e. as long as the County proves there is a substantial likelihood, based on Rachel's treatment record, that she would be a proper subject for commitment if treatment were withdrawn. *See D.J.W.*, 391 Wis. 2d 231, ¶¶33-34.

¶14    Whether the County presented sufficient evidence that Rachel is dangerous is a mixed question of law and fact. *See id.*, ¶¶23-24. We will uphold a circuit court's findings of fact unless they are clearly erroneous. *Id.*, ¶24. Whether the facts satisfy the statutory standard of dangerousness is a question of law that we review independently. *Id.*, ¶25.

¶15    The thrust of the County's argument is that Rachel has a "cycle of dangerous behavior," such that if treatment were withdrawn, there is a substantial likelihood that Rachel would behave dangerously and new commitment proceedings would need to be initiated. *See* WIS. STAT. § 51.20(1)(am). The County asserts both Marmor and Dr. Bales provided credible testimony based upon their lengthy histories of treating Rachel, which included their experiences treating her in relation to her prior commitments. In the County's view, Marmor's and Bales' testimony established that Rachel is dangerous under § 51.20(1)(am) because she has historically failed to take her medications after she had been decommitted, resulting in her acting dangerously and requiring another commitment.

¶16    We agree that Marmor's and Dr. Bales' testimony describing Rachel's "cycle of dangerous behavior" is sufficient to demonstrate that she is dangerous and, thus, a proper subject for commitment if treatment were withdrawn pursuant to WIS. STAT. § 51.20(1)(am). *See Winnebago Cnty. v. S.H.*, 2020 WI App 46, ¶16, 393 Wis. 2d 511, 947 N.W.2d 761. Although the County relies on *Waukesha County v. J.W.J.*, 2017 WI 57, 375 Wis. 2d 542, 895 N.W.2d 783, to

support its argument, our published decision in *S.H.* is nearly identical to Rachel's case and, therefore, is more instructive.[5]

¶17    In *S.H.*, "Sarah" appealed from an order extending her involuntary commitment and from an order for involuntary medication and treatment. *S.H.*, 393 Wis. 2d 511, ¶1.  The circuit court ordered her commitment extended because, in relevant part, the testimony at the recommitment hearing established that, pursuant to WIS. STAT. § 51.20(1)(am), if Sarah's treatment were withdrawn, she would become a proper subject for commitment. *S.H.*, 393 Wis. 2d 511, ¶¶1-2.

¶18    Only one witness, Dr. Michael Vicente, testified at Sarah's recommitment hearing.  *Id.*, ¶2.  He had been treating Sarah since 2015 (approximately four years) and met with her regularly.  *Id.*, ¶3.  Vicente diagnosed Sarah with paranoid schizophrenia, which substantially impaired her thoughts and perception when she was not under treatment and grossly affected her judgment and capacity to recognize reality.  *Id.*  Vicente further testified that Sarah would become a proper subject for commitment if treatment were withdrawn because she neither believed she was mentally ill nor believed she needed treatment.  *Id.*, ¶4. Vicente thus opined there was a "very high likelihood" that Sarah would discontinue treatment without an extension of her orders, and he based his opinion on her history of discontinuing her medication when off of commitment, which had resulted in hospitalizations and further commitments.  *Id.*

---

[5] This court issued *Winnebago County v. S.H.*, 2020 WI App 46, 393 Wis. 2d 511, 947 N.W.2d 761, on June 17, 2020, before briefs were submitted in the instant matter.  Neither party cited to *S.H.* in their respective briefs.  Normally, we request supplemental briefing from parties to address pertinent authorities issued near or after briefing has concluded that were not addressed in their briefs.  However, given the expedited timeline in which we address this appeal and the clear similarities of fact and law between this case and *S.H.*, we declined to request supplemental briefing here.

¶19 Doctor Vicente further testified that he had generally observed no paranoia in Sarah for the past few years prior to the recommitment hearing, save for one instance in July 2018. *Id.*, ¶5. On that occasion, Sarah had paranoid ideation caused by a previous change in medication. *Id.* Vicente explained that "some of the old things that had been bothering [Sarah] were resurfacing," which included her discussing a time in her past when she brought a baseball bat to work. *Id.* Vicente testified that although Sarah had not evidenced dangerous behavior under his care, his one attempt to change her medication, as just discussed, led to her "becoming more paranoid which has led to dangerous behaviors in the past." *Id.*, ¶6.

¶20 On appeal, Sarah argued Winnebago County, through Dr. Vicente's testimony, had failed to establish that she was dangerous because it did not link a finding of dangerousness under WIS. STAT. § 51.20(1)(am) to at least one of § 51.20(1)(a)2.'s statutory standards of dangerousness. *S.H.*, 393 Wis. 2d 511, ¶12. We disagreed. *Id.*, ¶13. We noted that "[a]t least up to a point, Sarah's position has merit," *id.*, as there was "no question that both the County and the [circuit] court could have done more to address dangerousness with reference to the statutory standards for initial commitment," *id.*, ¶14. In fact, we determined the County had failed "during its case in chief to present sufficient evidence of dangerousness." *Id.*, ¶17.

¶21 Despite the County's failures and its cursory arguments regarding the element of dangerousness on appeal, *id.*, we ultimately determined that "neither [WIS. STAT. § 51.20(1)(am)] nor the applicable case law requires an expert or circuit court to speculate on the precise course of an individual's impending decompensation by identifying specific *future* dangerous acts or omissions the individual might theoretically undertake without treatment." *S.H.*,

10

393 Wis. 2d 511, ¶13. We observed further that "[d]angerousness in an extension proceeding can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions (provided, of course, that there is a proper foundation for the latter)," all of which "involve[] a fact-intensive weighing of the evidence so as to arrive at an educated conclusion as to the likelihood of reoccurring dangerousness." *Id.*, ¶13 & n.6.

¶22     With the foregoing guiding our analysis, we then concluded that the County met its burden of proving Sarah was dangerous under WIS. STAT. § 51.20(1)(am). *See S.H.*, 393 Wis. 2d 511, ¶16. We determined the circuit court's "indirect[]" findings regarding Sarah not believing she needed medication, her hospitalization and further commitment when not taking her medications, and Dr. Vicente's "unrebutted discussion of his history treating [her] … support a finding that Sarah engages in dangerous behavior when not on medication." *Id.*, ¶15. We explained:

> Vicente brought up a specific prior instance of dangerous behavior that was directly tied to postcommitment paranoid ideations relating to the same incident, and that resurfaced following a change in medication. This provided the necessary link between past dangerousness and the substantial likelihood of reoccurrence of such behavior absent an extension order—particularly in light of Vicente's oft-repeated testimony that Sarah is highly likely to stop taking her medication without that order and in the absence of any rebuttal testimony.

*Id.*, ¶17. We therefore concluded, "Vicente's testimony 'connected the dots,' supporting the court's final determination that Sarah would repeat this cycle (end of commitment/going off medication/dangerous behavior/recommitment) if her commitment order were not extended." *Id.*, ¶15.

¶23    ***S.H.*** and Rachel's case are identical in all material respects, such that we are compelled to similarly conclude that the County met its burden of proving Rachel was dangerous under WIS. STAT. § 51.20(1)(am).    *See **Cook v. Cook***, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997) (court of appeals is bound by its own published precedent).    To begin, and just like in ***S.H.***, both the County (at the recommitment hearing and in its appellate arguments) and the circuit court could have done more to address dangerousness with reference to the statutory standard for commitment.    *See **S.H.***, 393 Wis. 2d 511, ¶14.    Yet, similarly, those failures do not require reversal here.

¶24    In ***D.J.W.***, our supreme court recently directed that "*going forward* circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of [WIS. STAT.] § 51.20(1)(a)2. on which the recommitment is based."    ***D.J.W.***, 391 Wis. 2d 231, ¶59 (emphasis added).    As Rachel's January 9, 2020 extension order predates our supreme court's April 24, 2020 decision in ***D.J.W.***, its directive is inapplicable.    *See **S.H.***, 393 Wis. 2d 511, ¶14.    Thus, the failure to abide by ***D.J.W.***'s forward-looking directive cannot, in and of itself, mandate reversal here.    This is so even though we agree with Rachel that the lack of specific reference to a statutory standard of dangerousness she was alleged to have evidenced could indicate the County failed to meet its burden of proof.

¶25    There are clear and convincing facts in the record, however, to satisfy the dangerousness requirement of WIS. STAT. § 51.20(1)(am).    Marmor's and Dr. Bales' testimony provided a link between Rachel's past dangerousness and the substantial likelihood of reoccurrence of such behavior absent an extension order.    And they did so in a manner similar to Dr. Vicente's testimony

regarding Sarah's past dangerousness in *S.H.* In fact, we believe the testimony here created a stronger link than that established in *S.H.*

¶26 Marmor had a longtime professional relationship working with Rachel. Based on the rapport he had built with her, Marmor testified that, historically, if treatment were withdrawn, Rachel would become "impulsive, irritable, dangerous, and in the state that [he has] seen her at several points in time throughout the past." Specifically, Marmor testified that the decompensated state of Rachel's with which he was familiar included her "making threats to her family members."

¶27 Doctor Bales provided even more testimony "connecting the dots" that Rachel would be dangerous if treatment were withdrawn. Like Dr. Vicente in *S.H.*, Bales was Rachel's treating physician and had been treating her for a number of years. Although Bales' testimony was vague as to when Rachel would historically stop taking her medications after decommitment, his testimony aligned with Marmor's that Rachel has a history of noncompliance with taking her medications when not under a commitment. Bales stated Rachel "will gradually get off her medication" and that "[n]obody knows when, but she'll go off of it and then she will become psychotic within—usually it's a couple of months."

¶28 The circuit court implicitly found Marmor and Dr. Bales to be credible witnesses, as it could not have otherwise determined Rachel would be a proper subject for commitment if treatment were withdrawn. *See State v. Martwick*, 2000 WI 5, ¶31, 231 Wis. 2d 801, 604 N.W.2d 552 ("[I]f a circuit court fails to make a finding that exists in the record, an appellate court can assume that the circuit court determined the fact in a manner that supports the circuit court's ultimate decision."). In so doing, the court, like the circuit court in *S.H.*, indirectly

found that Rachel did not believe she needed medication, and, as a result, she would not take her medications when not involuntarily committed, leading her to further hospitalization and commitment. That fact, along with Marmor's and Bales' discussions of their history working with and treating Rachel (including Marmor's testimony regarding how Rachel had made threats to her family when in a decompensated state), supports a finding that Rachel engages in dangerous behavior when not on a therapeutic dose of her medications.

¶29 If Rachel were to challenge our reliance on *S.H.*, she might point to our statement regarding Dr. Vicente's "*unrebutted opinion … that Sarah has gone through and will likely repeat the 'revolving door' cycle without a commitment order*" as a distinction that is materially different from Rachel's case. *See S.H.*, 393 Wis. 2d 511, ¶18 (emphasis added). Here, Rachel testified at her recommitment hearing that she would continue her medications absent an extension order, and she provided her reasons for continuing to do so. This factual difference is inconsequential, however, because the circuit court implicitly found Marmor's and Dr. Bales' testimony more credible than Rachel's with regard to whether she would again discontinue medication without a commitment order. The circuit court is the ultimate arbiter of credibility, to which we owe deference on appeal. *See State v. Peppertree Resorts Villas, Inc.*, 2002 WI App 207, ¶19, 257 Wis. 2d 421, 651 N.W.2d 345.

¶30 As was repeated often throughout the recommitment hearing, Marmor's and Dr. Bales' testimony was based on their experiences treating and working with Rachel, such that their opinions and predictions had proper foundation and were not pure conjecture. *See Marathon Cnty. v. D.K.*, 2020 WI 8, ¶52, 390 Wis. 2d 50, 937 N.W.2d 901; *see also S.H.*, 393 Wis. 2d 511, ¶13 & n.6. Like Dr. Vicente's testimony in *S.H.*, Marmor's and Bales' testimony

14

"connected the dots" supporting the court's final determination that Rachel would repeat this cycle of ending her commitment, going off her medications, behaving dangerously, and later being recommitted if her commitment order were not extended. We conclude the court's factual finding that Rachel will not continue to take her medications absent a commitment order is not clearly erroneous.

¶31    In all, we acknowledge that Rachel's arguments are not without some merit, particularly given that the recommitment hearing transcript and the County's appellate arguments leave much to be desired, and especially in light of our supreme court's recent decision in *D.J.W.*  Even so, this case is indistinguishable in all material ways from *S.H.*, and we are bound by that decision. Consistent with our decision in *S.H.*, sufficient credible testimony was elicited at the recommitment hearing here such that the circuit court correctly concluded Rachel would be a proper subject for commitment if treatment were withdrawn and correctly concluded an extension should be granted pursuant to the "dangerousness" standard of WIS. STAT. § 51.20(1)(am).  We therefore affirm.

*By the Court.*—Orders affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.